THE TOWN OF SHARON *vs.* GEORGE W. GAGER AND ANOTHER.

*G*, who was treasurer of a town, became a defaulter. One of the selectmen of the town applied to *G's* maiden aunt, to whom he was a stranger, and after referring to the defalcation, of which she had just before been informed, stated that her nephew had exposed himself to a criminal prosecution and imprisonment in the state prison; and that unless she immediately secured the town against loss criminal proceedings would on that day be instituted. The aunt was an elderly woman, feeble in body, of an excitable temperament, wholly without business experience or self-reliance, and was greatly attached to her nephew, having lived in the same house with him from his birth. She was greatly agitated and expressed herself as willing to do anything to save her nephew from the state prison. The selectman left her in this state of mind and half an hour after returned with a lawyer, who drew a mortgage of certain real estate which she owned, which she signed without deliberation or asking advice of her friends and in the belief that the town would at once procure the prosecution of her nephew if she did not, and solely to save him from such punishment. Upon a bill for a foreclosure of the mortgage brought by the town, it was held—

1.   That a court of equity would refuse to enforce a contract of suretyship entered into under such circumstances.

2.   That it did not alter the case that the selectman believed that *G* was liable to a criminal prosecution and punishment in the state prison.

BILL for the foreclosure of a mortgage; brought to the Superior Court in Litchfield County. The following facts were found by a committee upon the bill and answer:

On the 6th day of March, 1874, Samuel L. Gager, of the town of Sharon, resigned the office of treasurer of the town, which he had held by successive elections since October, 1872; and at the time of his resignation he was a defaulter in his

office to the amount, as afterwards ascertained, of $2,428.12. He had given no bond at his last re-election. He was at the time a member of the mercantile firm of Gager Brothers, and, with the firm, had been for some time in failing circumstances, and a few days after both made assignments in insolvency.

On the 5th day of March, 1874, Chesterfield Chapman, one of the selectmen of Sharon, knowing of the defalcation of Samuel Gager, and of his embarrassed circumstances, visited the store of Gager Brothers, in Sharon, for the purpose of an interview with him. Chapman at this interview demanded of Gager a settlement of his account with the town as treasurer. Gager declined to settle, and gave as his reason that he could do nothing about it until his business affairs were in different shape. Thereupon Chapman asked him whether his aunt Julia would not "fix it up" for him.

Julia Gager was a maiden lady, then aged sixty-three years, a sister of George W. Gager, the father of Samuel Gager. Since the marriage of the said George in the year 1840, Julia Gager had statedly resided with him and in his family, till her decease, assisted in the rearing of his children, and was strongly attached to the entire family. Samuel was the eldest child, and the favorite nephew of the said Julia. She was at this time the only member of the family with unincumbered estate.

Said Julia was a woman of average native powers, and of more than average culture and refinement; her health was feeble, her emotional nature was strong and easily excited, and her experience in business affairs extremely limited, she always relying upon the judgment of some other member of her family in the purchase of all her wardrobe and necessaries.

Upon the suggestion of Chapman at this interview Samuel Gager went at once to his father's house, and there had an interview with his aunt, and informed her of his interview with Chapman and of his demand. At the same time, Chapman went to the office of Mr. Sedgwick, in Sharon, and consulted him in the matter as attorney for the town.

About half an hour after their separation at Gager Brothers' store, and after their several interviews with Julia Gager and Mr. Sedgwick, Chapman and Samuel met again at the store of Gager Brothers, when Samuel informed Chapman that he had seen his aunt Julia, had told her the facts in the matter, and acquainted her with Chapman's demand, but that he had not asked her, nor would he ask her, to secure the town on her estate.

Thereupon Chapman went alone to the house of George W. Gager and had an interview with said Julia. Chapman and Julia were strangers. His manner was rough and stern. He informed her that he had come to have her secure or reimburse the town for the money her nephew Samuel had taken, and in the same connection said, by way of interrogatory to her, "You know what the penalty is?" (referring to the offence of Samuel in wrongfully taking money of the town,) and immediately answering his own question said, "It is five hundred dollars and state prison;" and further stated to her that the matter must then be done right up, or he should that day take Samuel off and have him attended to.

Thereupon Julia became greatly agitated, and declared to him her willingness to do any thing to save Samuel from state prison; that she would give all she had or do any thing to save him. She asked Chapman if her note would be satisfactory. He declined a note, and demanded a mortgage of real estate, and said he would go down and get Sedgwick to come right up and fix it.

Chapman went immediately for Mr. Sedgwick, and about half an hour after returned with him to the house, where Mr. Sedgwick drew a mortgage deed of the real estate owned by the said Julia, to the town of Sharon, to secure the amount of the money of the town then in the hands of said Samuel as town treasurer, which deed the said Julia then executed and acknowledged and delivered to Chapman.

The deed was on the same day lodged with the town clerk of Sharon by Chapman for record.

Said Julia executed, acknowledged and delivered the mortgage for the sole purpose of saving her nephew from the dis-

grace of imprisonment in the state prison. She signed the deed in the belief that the statement of Chapman was true, that he would procure his prosecution and imprisonment if she did not secure the debt, and this belief induced her to sign and deliver it.

Julia Gager, in two mortgages of the same real estate, subsequently executed, one to one Bartram and the other to one Church, referred to this mortgage to the town as an existing encumbrance on the property and excepted it in terms in the covenants of warranty and against encumbrances.

Julia Gager died on the 27th of April, 1875, by her last will devising the real estate to Aurelia L. Gager, wife of her brother George W. Gager, who was the father of Samuel L. Gager. The said George and Aurelia are the respondents.

Upon these facts the case was reserved for the advice of this court.

*D. J. Warner* and *D. T. Warner*, with whom was *C. F. Sedgwick*, for the petitioners.

1. Julia Gager, the mortgagor, is not found by the committee to have been incompetent or insane, but on the contrary to have been a person of average native powers, and of more than average culture and refinement. Clearly from the facts found it does not appear that at the time of executing the mortgage she was under "*duress per minas.*" To constitute "*duress per minas*" the threats of injury must be offered to the party executing the deed, and not to a third party. A surety cannot plead the duress of his principal. 1 Parsons on Cont., 393, note *v; * 1 Swift Dig., 311; *Smith* v. *Rowley*, 66 Barb., 502. In the last case cited, and similar to the one at issue, *A*, charged by *B* with embezzling from him, *C*, the wife of *A*, at his request and upon an understanding with *B* that he would refrain from prosecuting her husband, executed a conveyance of real estate to him (*B*,) and this without any other compulsion or duress than that arising out of the circumstances of the case. Held that this did not amount to legal duress. Where a party threatened with arrest and imprisonment by legal process, when in fact no

ground existed for a criminal arrest, gave a note for a just claim, it was held that the threats were no defence, and did not constitute duress. *Knapp* v. *Hyde*, 60 Barb., 80. As appears from the finding Miss Gager had ample time to consider the matter of giving a mortgage. 1st. She was informed by Samuel Gager of the facts of his own defalcation and the request of Mr. Chapman; 2d. She was again informed by Chapman of the same matters; and 3d. Still later in the presence of Sedgwick she solemnly executed the deed according to law without objection and of her own free act and deed.

2. There was a sufficient consideration for the deed. It was clearly Mr. Chapman's duty to secure the debt due the town from Samuel Gager. He requested Samuel to lay the facts before his aunt, and he did so fully, and thereby he impliedly requested her to assist him in the matter, she being the only member of the Gager family, as found by the committee, having property and who could secure the debt. It was certainly a proper thing for the selectman, after he was informed by Samuel that he had seen her and told her the facts in the matter, to personally make the same request of her. He practiced no fraud upon her. It certainly was true that Samuel was a defaulter, and although Chapman was honestly mistaken as to the extent of Samuel's liability to punishment, yet it is true that his body was liable to attachment and imprisonment, he being a public officer. Gen. Statutes, 460, sec. 28. The burden rests upon the respondents to show that there was any fraud upon the part of Chapman. This they failed to do, as the committee reports none. Forbearance to institute legal proceedings is a good consideration. By the execution of the mortgage Samuel was saved from the disgrace of having an execution levied upon his body and suffering imprisonment. 1 Swift Dig., 189; 1 Parsons on Cont., 440, 443; Chitty on Cont., 33; *Pratt* v. *Humphrey*, 22 Conn., 322.

3. The deed was not absolutely void for want of consideration, or on account of duress, but only voidable. Mere threatening a lawsuit is no duress. 1 Parsons on Cont., 395;

3 Washb. R. Prop., book 3, ch. 4, sec. 1, art. 25; *Evans* v. *Gale*, 18 N. Hamp., 401. The petitioners claim that Julia Gager, by the recitals in her two mortgage deeds to Bartram and Church respectively, both executed subsequently to the mortgage in question, stating that the Bartram and Church mortgages were subject to the mortgage deed to the town of Sharon, ratified and confirmed in the most solemn manner her former act in executing the mortgage to the town, and is estopped by these recitals from avoiding the deed on account of duress, or want of consideration. A party executing a deed is estopped by the recital of a particular fact in that deed to deny the fact. 1 Swift Dig., 621; 2 Parsons on Cont., 789. Where a person executed a deed while incompetent from disease, but acquiesced in it when he had recovered, it was held that this amounted to a confirmation. *Jones* v. *Evans*, 7 Dana, 96.

*C. B. Andrews*, for the respondents.

1. Miss Gager at the time she executed and delivered the mortgage was not a free agent. She was under duress. She was coerced into giving the deed. The facts found clearly show this. Where the party in such a case is not a free agent and is not equal to protecting himself, the court will protect him. This is the constant rule in equity. 1 Story Eq. Jur., § 234; *Crowe* v. *Ballard*, 1 Ves. Jr., 215, 220; *Hawes* v. *Wyatt*, 3 Brown Cha., 158. Equity will set aside a contract entered into by a party in extreme distress, whenever there are any circumstances of oppression, fraudulent advantage or imposition attendant upon it. Smith's Manual of Equity, 69; Snell's Eq., 395; *Gould* v. *Okeden*, 3 Brown P. C., 560; *Wood* v. *Aubrey*, 3 Madd. Ch., 417; *Pickett* v. *Loggon*, 14 Ves., 215; *Beasley* v. *Magrath*, 2 Sch. & Lef., 31; *Evans* v. *Llewellyn*, 1 Cox, 340; *Boyse* v. *Rossborough*, 6 H. L. Cas., 2, 49; *Williams* v. *Bayley*, L. Reps. 1 H. L. Cas., 200. If deeds are obtained by the exercise of undue influence over a person whose mind is not a safe guide to his actions, it is against conscience for him who has obtained such a deed to derive any advantage from it. That a court of

equity will interpose in such a case, is among its best settled principles. *Harding* v. *Wheaton*, 2 Mason, 378, 386; *Harding* v. *Handy*, 11 Wheat., 125; *Whelan* v. *Whelan*, 3 Cowen, 537, 572; *Fermor's Case*, 3 Coke, 77, 78.

2. The subsequent deeds cannot be regarded as a confirmation unless it is shown that she was aware of the invalidity of the first one, and that she had independent advice concerning them. *Hoxie* v. *Home Ins. Co.*, 32 Conn., 21, 40; *Kempson* v. *Ashbee*, L. Reps., 10 Ch. App., 15; *Allore* v. *Jewell*, 94 U. S. Reps., 512.

3. But giving the petitioners the most favorable construction which they can claim under the finding, the transaction between Chapman and Miss Gager was an arrangement to stifle a prosecution. Public policy will not permit the petitioners to reap any advantage from such an arrangement. *Walbridge* v. *Arnold*, 21 Conn., 424.

PARDEE, J. An elderly woman, feeble in body, of an excitable temperament, and habitually relying upon the judgment of others in matters of business, is informed by her nephew, who had been reared in the family of which she was a member, and to whom she was greatly attached, that he was a defaulter to the town; this announcement is presently followed by a declaration from Mr. Chapman, the selectman, that the nephew had exposed himself to a criminal prosecution and punishment in the state prison, and that, unless she immediately secured the town against loss, criminal proceedings would on that day be instituted against him. He left her greatly agitated in her mind, and within about half an hour returned with an attorney and offered the mortgage in question for her signature. She signed it without time for deliberation, and without the advice of counsel or friends.

The finding makes it certain that Mr. Chapman believed, and intentionally produced in the mind of Miss Gager the belief, that her nephew had exposed himself to a criminal prosecution; that such prosecution would be immediately commenced unless she executed the mortgage; that the execution of the mortgage would stifle it; and that he knew that

she executed it for that purpose solely. For reasons of public policy a court of equity will refuse to enforce a contract of suretyship entered into under such circumstances.

In *Williams* v. *Bayley*, 1 L. R., Eng. & Irish Appeals, House of Lords, 200, one Bayley obtained money from the plaintiffs by forging his father's name. Upon discovery they insisted (though without any direct threat of a prosecution,) on a settlement, to which the father was to be a party; he consented, and executed an agreement to make an equitable mortgage of his property. Held, that the agreement was invalid. The Lord Chancellor said:—"But here was a pressure of this nature. We have the means of prosecuting, and so transporting, your son. Do you choose to come to his help and take on yourself the amount of his debts, the amount of these forgeries? If you do, we will not prosecute; if you do not, we will. That is the plain interpretation of what passed. Is that, or is it not, legal? In my opinion, my lords, I am bound to go the length of saying that I do not think it is legal." Lord Chelmsford said:—"The defence of the bankers being rested entirely on these two grounds, as I have already said, in my opinion this negotiation proceeded upon an understanding between the parties that the agreement of James Bayley to give security for the notes would relieve William Bayley from the consequences of his criminal act; and the fears of the father were stimulated and operated on to an extent to deprive him of free agency, and to extort an agreement from him for the benefit of the bankers. It apppears to me therefore that the case comes within the principles on which a court of equity proceeds in setting aside an agreement where there is inequality between the parties, and one of them takes unfair advantage of the situation of the other, and uses undue influence to force an agreement from him." Lord Westbury said:—"What remained then as a motive for the father? The only motive to induce him to adopt the debt, was the hope that by so doing he would relieve his son from the inevitable consequences of his crime. The question therefore, my lords, is, whether a father appealed to under such circumstances to take upon himself an amount

of civil liability, with the knowledge that, unless he does so, his son will be exposed to a criminal prosecution, with the certainty of conviction, can be regarded as a free and voluntary agent? I have no hesitation in saying that no man is safe, or ought to be safe, who takes a security for the debt of a felon, from the father of a felon, under such circumstances. A contract to give security for the debt of another, which is a contract without consideration, is, above all things, a contract that should be based upon the free and voluntary agency of the individual who enters into it. But it is clear that the power of considering whether he ought to do it or not, whether it is prudent to do it or not, is altogether taken away from a father who is brought into the situation of either refusing, and leaving his son in that perilous condition, or of taking on himself the amount of that civil obligation."

The petitioner says that Mr. Chapman erred in his belief that the default of the nephew was punishable as an offence. This being so, the deed has no better foundation than a mistaken belief as to facts, produced by the erroneous statement made and persisted in by the agent of the town, and therefore it should be set aside.

In *Davies* v. *London & Provincial Marine Ins. Co.*, L. Reps. Chancery Div., Vol. 8, 469, the officers of a company, believing that the retention of money by one of their agents amounted to a felony, directed his arrest. Certain friends of his came to the officers of the company and proposed to deposit a sum of money by way of security for any deficiency. On the same day the company was advised that the acts of the agent did not amount to felony, and the directions for the arrest were withdrawn. Later in the day the friends of the agent had a second interview with the officers of the company, and agreed to deposit a sum of money as security for his defaults, no mention being made of the withdrawal of the directions for the arrest. The sum of money was afterwards deposited with trustees on an agreement for the security of the company. Held that the change of circumstances ought to have been stated to the intending sureties, and that the agreement must be rescinded and the money returned to the

sureties. Fry, J., said:—"But I do think that the contract of suretyship is, as expressed by Lord Westbury in *Williams* v. *Bayley*, L. R., 1 H. L., 200, one which should be based upon the free and voluntary agency of the individual who enters into it. I think that principle especially applicable here, because there is no consideration in this case, as in many cases of suretyship, for the contract so entered into; and therefore I think, to use the language of Lord Eldon in *Turner* v. *Harvey*, Jac., 169, it is a contract in respect of which a very little is sufficient. Very little said which ought not to have been said, and very little not said which ought to have been said, would be sufficient to prevent the contract being valid. It is one, furthermore, in which I think that everything like pressure used by the intending creditor will have a very serious effect on the validity of the contract; and the case is stronger where that pressure is the result of maintaining a false conclusion in the mind of the person pressed."

We advise the Superior Court to dismiss the petition.

In this opinion the other judges concurred.