JAMES LOMERSON

*v.*

LEVI S. JOHNSTON et ux.

1. When a married woman voluntarily joins with her husband in executing a mortgage on her own real estate, to secure a pre-existing debt of his, a new or independent consideration is not required.

2. Where the creditors of the husband induced his wife to join with her husband in giving a mortgage on her real estate to secure his debt, by telling her that her husband had been guilty of the crime of embezzlement, and could be imprisoned for it, and that another, who was interested, had just said he would see him in jail before he would do anything to relieve him, and it appears that such statements created fear or just apprehension, the reasonable conclusion is that the free agency of the wife was overcome; that the execution of the mortgage was obtained by undue pressure, and that it cannot be enforced against the wife's real estate.

*Messrs. J. G. Shipman & Son,* for the complainant.

*Mr. W. H. Morrow,* for the defendants.

BIRD, V. C.

The complainant files a bill to foreclose a mortgage which was given to him by the defendants to secure the payment of a bond given by the defendant, Mr. Johnston, to the complainant, conditioned for the payment of $6,432.02. Mrs. Johnston files her answer, and resists the foreclosure of this mortgage, upon the ground that she was induced to join with her husband in executing this mortgage upon her separate estate by unlawful influences, threats of the imprisonment of her husband, the real debtor, and other fraudulent practices, upon the part of the complainant, amounting to undue pressure.

Mr. Johnston was the executor of his father-in-law's will; the complainant, Mr. Lomerson, became one of his sureties for the performance of the trust. In the progress of the settlement of the estate, Mr. Johnston gave to the complainant two bonds, one

for $6,000 and one for about $6,400, secured by a mortgage on certain real estate of Mr. Johnston's. Mrs. Johnston joined in the execution of this mortgage. On the 7th of July, 1883, but a few months after the execution of the mortgage already mentioned, the mortgage now in suit was executed by Mr. and Mrs. Johnston; and the question is, under the pleadings and the proof, whether or not, under the circumstances of the case, Mrs. Johnston is entitled to be relieved from this mortgage or not.

At the time of the execution of this mortgage, Mr. Johnston was about seventy-six years of age, and was feeble in health. However, there is nothing to show that he was feeble in mind, or in any way broken down physically. He was not only about the premises at the time, but he called upon the attorney, who prepared the mortgage on the day it was prepared; but whether he asked him to prepare it or not does not appear. Mrs. Johnston, who was well advanced in years, had suffered a good deal of anxiety because of business troubles in the family, and because of the loss of three of her children. But there is nothing in the appearance of Mrs. Johnston upon the witness stand, nor in her expressions as a witness, which would indicate any incapacity upon her part to understand ordinary business transactions and the reasonable effects to flow therefrom. It will be seen that I must come to this conclusion with respect to Mrs. Johnston, who testifies in her own behalf, in order to give any very great efficacy to her statements as a witness. She says that Mr. Lomerson came to her house, and said that he wanted her to give a mortgage as collateral security for the payment of this $6,400, this being the amount of money due to persons known as the Hornbacker heirs. She inquired who wanted her to give this mortgage, and Mr. Lomerson said they were Mr. Shipman, who was a prominent lawyer in the village, and a warm friend of Mrs. Johnston's, and a Mr. McMurtrie, who might be called upon as surety. She replied that she could not do it, and asked Mr. Lomerson if he wanted to send her to the poorhouse. She says Mr. Lomerson then said, "If you don't, Levi will go to jail." She inquired who would put him there, and Lomerson said Mr. Shipman would. At this instant, her daughter

Carrie, who was present, said to her mother, "Don't you do it," when Mrs. Johnston said, "Father cannot live through it," referring to her husband. Mr. Lomerson wanted Carrie to put her lot in also, and she refused to do it. While this interview was progressing, dinner was served. Mr. Lomerson, having been a warm friend of the family for a long time, dined with them. After dinner, Mr. James M. Robeson, counsel for Mr. Lomerson, brought the bond and mortgage, which were executed by Mr. Johnston, and acknowledged before Mr. Robeson, after which Mrs. Johnston signed, and acknowledged the same according to the statute. Mr. Robeson has since died, and his testimony cannot be had. Mrs. Johnston says, when she signed, and acknowledged the execution of the mortgage, that she was asked by Mr. Robeson if she executed the same freely, and that she said "No." It appears that the daughter, although not present in the same room, was in the hall very near by, at the time of the execution and acknowledgement of the mortgage by Mrs. Johnston. The daughter's testimony is substantially the same as Mrs. Johnston's. She says that Mr. Lomerson asked her mother to sign the mortgage, and when he said that Mr. Shipman was urging it, and that if father did not sign they would put him in jail, that she said to Mr. Lomerson she did not believe it. She corroborates her mother in saying, when her mother was asked if she executed the mortgage freely, she said she did it to keep father out of jail. From her statement, it appears that she afterwards inquired of Mr. Shipman and Mr. McMurtrie whether they had had anything to do with this transaction, and was informed by them that they had not. She says that she then went to Mr. Lomerson and urged him to give the property back and surrender the mortgage. She says that Mr. Robeson was there half an hour, and that her father was present. It is very clear from the testimony in the cause, that no proceedings whatever were at that time instituted, or about to be instituted, against Mr. Johnston, the debtor.

Mr. Lomerson says, in speaking upon the subject of this interview, that he told Mrs. Johnston and her daughter that Mr. McMurtrie said that, unless she gave a mortgage on her lot, he would see her husband go to jail, before he would pay a dollar

of this claim. When Mrs. Johnston asked if they could do that, he replied, saying, "Oh, yes, they can; that is embezzlement," and gave them an instance of parties being sent to jail, in Newark, for the unlawful use of trust funds. Then Mrs. Johnston said to her daughter, "Why, Carrie, what shall I do?" And Carrie said, "I would not do it." After further conversation, he says that he said to Mrs. Johnston, "If you say you will, I will go and get Mr. Robeson to write the mortgage," and he went. Mr. Johnston went with him. He says that this was in the afternoon; that he went to his home, and returned the next morning; and that when he went into the house, the daughter, Carrie, said to him that Mr. Robeson was then reading the mortgage over. Mr. Johnston signed it, and stepped out of the room when Mrs. Johnston signed. He again repeats that all he told Mrs. Johnston was what Mr. McMurtrie had said, and says that Mr. McMurtrie told him that. He positively denies making any threats. He says, further, that there was nothing due at that time to any of the Hornbacker heirs upon their claim; and also says that no proceedings had been begun.

While the principal contention is with respect to the question whether there was in contemplation of law a contract or not which could be enforced, it is due to the defendants to notice another point earnestly presented, which is to the effect that if this mortgage was not obtained by duress or false representations amounting to a fraud, under any other circumstances which prevented Mrs. Johnston from acting as a free and voluntary agent, it, nevertheless, cannot be enforced because it is without any *new* consideration. It was given by the wife upon her separate estate, to secure the pre-existing debt of the husband, and is, therefore, void. Reliance is placed upon the law as laid down in *Brandt on Surety* § *9,* and *Jones on Mort.* §§ *615, 1137,* and the case of *Pratt* v. *Hedden, 121 Mass. 116, 121,* and *Ellis* v. *Clark, 110 Mass. 389, 392.*

I do not think a new and distinct consideration has been made requisite in such cases in this state. When the following cases are carefully considered, I think it cannot be claimed that they recognize any such doctrine. *Merchant* v. *Thompson, 7 Stew. Eq.*

*73*, and cases cited therein. It seems to me that if the doctrine had been favored in this state, it would have been applied to a portion of the claim in the case of *Campbell* v. *Tompkins, 5 Stew. Eq. 170.* See, also, *Galway* v. *Fullerton, 2 C. E. Gr. 389,* and *Armstrong* v. *Ross, 5 C. E. Gr. 109.*

We come now to the consideration of the main question, which is, does enough appear by way of proof in this case to satisfy the judicial mind that Mrs. Johnston was so influenced, by what was said by Mr. Lomerson, as to deprive her of her free agency in the making of this mortgage? There is no dispute but that the criminal liability of Mr. Johnston, the husband, was spoken of by Mr. Lomerson. He admits saying that Mr. McMurtrie had said he would see Mr. Johnston in jail before he would pay one dollar of his claim, unless Mrs. Johnston executed this mortgage. He admits, further, saying that when Mrs. Johnston asked if that could be done, that he said it could, and called her attention to the fact that persons had been put to jail for the wrongful use of trust funds. Now, the moneys which it was sought to secure by mortgaging her lot were trust moneys. Mrs. Johnston was apprised of this fact. It was very well understood that Mr. Johnston was greatly in arrears in his payments, and was wholly unable to pay out of his own estate. The two bonds and mortgages, which had previously been given to secure the same moneys, were thought, at the time, to be inadequate, although that fact had not been practically determined, at the time of the execution of this mortgage, by a foreclosure and sale. The conclusion cannot be overcome, that, considering her age, and the condition of the health of her husband, but that she might have some reasonable apprehensions of disaster to him because of his financial embarrassments. The insistment of Mr. Lomerson that he made no threats directly, when he admits saying that he gave the incidents which I have named, affords no excuse or palliation. If the statements which he made, to the effect that Mr. Johnston had been guilty of embezzlement, and to the further fact, upon inquiry by Mrs. Johnston, that for such embezzlement he was liable to be imprisoned; and that he was aware of the fact that several persons

had recently been imprisoned for such misconduct, were made by way of threat, or were made for the purpose of influencing her mind, by Mr. Lomerson, then such statements go very far towards bringing the case within several cases which have had the very highest judicial consideration, and which cases, very properly, have great influence upon my mind. But, upon the other hand, if there were no observations made by Mr. Lomerson by way of threat, such as that Mr. Shipman and Mr. McMurtrie had commenced proceedings against Mr. Johnston already, and that they would put him in prison if she did not give this mortgage, but were observations made in ordinary conversation between friends, he, simply answering inquiries according to the best of his understanding, then, very clearly, nothing that he said or did would in itself be illegal, or could improperly influence her free agency. If he undertook to impose upon her, or to gain an advantage, even though the words used by him be strictly true, yet, in the eyes of a court of equity, it might be considered very inequitable that he should hold any advantage which he thereby secured. But, if the supposed wrong or imposition resulted, not from any design upon his part, but was sought by Mrs. Johnston in the pursuit of reasonable and proper inquiries respecting her husband's affairs, a very different case would be presented. Now, my conclusion respecting the testimony upon this head is, that Mr. Lomerson went to Mrs. Johnston for the purpose of asking her and persuading her to join her husband in the execution of this mortgage; and that, in order to do so, he certainly made allusions to her husband's criminal liability for the wrongful appropriation of trust funds, and that, in order to impress this upon her mind, according to his own statements, he said to her that McMurtrie, on that morning, declared that he would see her husband in jail before he would pay one dollar, unless she joined in the execution of this mortgage upon her real estate; and that, in addition to this, he gave her the assurance of a friend, when she asked for information, that he could be put in jail for such alleged embezzlement. To this extent the statement of Mr. Lomerson goes. These statements must have made a most serious impression upon an affectionate

and loving wife. It is happy for us that all persons, male or female, are blessed with these tender sensibilities which quickly respond when peril is threatened to friend, a child, a husband or a wife.

There are several cases in our own reports which throw some light upon this subject, although I believe none of them go further than to lay down general principles, which are always of the utmost value in such cases, such as *Remington* v. *Wright, 12 Vr. 48; S. C., 14 Vr. 451; De Ronge* v. *Elliott, 8 C. E. Gr. 486; Tooker* v. *Sloan, 3 Stew. Eq. 394.*

The case of *Williams* v. *Bayley, L. R. (1 H. L.) 200* (also, *35 L. J. Ch. 717*), considered in the House of Lords, is of great interest. In that case, a father had endorsed for his son, after which the son forged numerous endorsements. At length, the holders of the paper, being bankers, pressed the father for a settlement. There was no proof that the father had ever sanctioned the forgeries, or in any way countenanced the unlawful transactions of the son. The holders of the paper, in fact, said to the father, "We don't know these to be forgeries—we don't believe them to be so; but your son is responsible for them, and if you don't help him, we must sue him for the amount." They did not say in direct words that the son was guilty of forgery, and that they should prosecute, and would enforce the penalties of the law. They must have believed they were forgeries; but they said, "We do not wish to exercise pressure on you, if it can be satisfactorily arranged;" and the inquiry, "What is the meaning of that?" The inquiry was, Does the word "pressure" mean pressure arising from exercising the power or keeping in the hands of the holders of this paper, the means of exercising the power of instituting a criminal prosecution? Or does it mean the pressure of getting you to make yourself responsible for your son's debt? It must have meant the former, because the context shows that the other was alternatively provided for when it was said, "We do not wish to exercise pressure, if it can be satisfactorily arranged." That could not mean, "If you take upon yourself without pressure, we do not mean to press you. If you can

satisfactorily arrange this, and if you choose," according to an-
other expression that was used, to treat it as a matter of busi-
ness, that is, to take upon yourself the debt, " we will not
exercise pressure. If you take that upon yourself, it will all
go smoothly; if you do not, we shall be bound to exercise pres-
sure," which could only mean, " To exercise those rights which
remain to us by reason of our holding signatures forged by your
son." The court put it in this light: " If you choose to take
upon yourself the responsibility of these bills, all will be right;.
but if not, we cannot be parties to compounding a felony." In
this case Lord Westbury said: " Now, with regard to the first
point, namely, whether this was the voluntary act of the plaintiff,
I would put two questions: first, What was the basis of the trans-
action or negotiations between the Appellants and the Respond-
ent that led to giving the security in question ; and, secondly,
what was the motive or inducement that was brought to bear
on the Respondent in order to induce him to give the security?
It was skillfully contended on the part of the Appellants, by
the learned counsel, that the basis of the transaction was either
the actual or the possible liability of the father to the debt. But
that is an argument wholly unsupported by the evidence ; and,
on the contrary, it is in every way contradicted by the evidence.
There is no ground for concluding, from anything that has been
said, that the bankers treated the father as a person who was
civilly responsible. There was no attempt on the part of the son
William Bayley, notwithstanding his distress, to assert at any
time that he had the authority of his father ; in point of fact,
the father's aid is invoked throughout upon the basis that the
son alone was liable, and that, in addition to civil liability, he
had contracted a criminal liability. Now, that is apparent, not
only from the passages which have been read by my two noble
and learned friends, but from the whole conduct of the Appellants.
It must be remembered throughout, that the Appellants did not
speak out distinctly, for the reason that is given by one of them
in a passage that has been referred to, namely, that they could
not in any manner be implicated in compounding a felony.
Again, there is a small incident that brings home, at least to

Lomerson v. Johnston.

my mind, in a satisfactory manner, the truth of the conclusion, that the criminal liability of William Bayley was the basis of the whole transaction, and that is the circumstance that Henry Williams wrote on a slip of paper, and communicated to his brother Philip, during the discussion, his own doubt whether the father might not be civilly liable. Now it is quite plain that if the discussion had proceeded, either wholly or partially, upon the notion that there might have been civil liability on the part of the father, the necessity for making such a suggestion by Henry to his brother Philip never could have arisen ; and it is perfectly clear, also, from the fact of the slip of paper not being either read out or acted upon, but, on the contrary, being thrown into the fire by Philip, that he was willing that the transaction should go on, on the basis on which it had been started, namely, that there was a *constat* of all parties that the forgeries had been committed, and that William Bayley, therefore, stood in the liability of a felon. So much in regard to the basis of the transaction. Now what was the motive or inducement which was brought to bear on the Respondent? After the attempt to get a good and unobjectionable security failed, the discussion did not terminate, but it was renewed, on the basis of the Plaintiff's coming forward to relieve his son from the situation of peril in which he was placed. The bankers admit, most clearly and distinctly, that they all knew that it was a case of transportation for life. It is perfectly clear that they did not pretend that the father was liable. What remained, then, as a motive for the father? The only motive to induce him to adopt the debt, was the hope that by so doing he would relieve his son from the inevitable consequences of his crime. The question, therefore, my Lords, is, whether a father, appealed to under such circumstances to take upon himself an amount of civil liability, with the knowledge that, unless he does so, his son will be exposed to a criminal prosecution, with the certainty of conviction, can be regarded as a free and voluntary agent? I have no hesitation in saying that no man is safe, or ought to be safe, who takes a security for the debt of a felon from the father of the felon, under such circumstances." Besides these observa-

tions, Lord Westbury added: "A contract to give security for the debt of another, which is a contract without consideration, is, above all things, a contract that should be based upon the free and voluntary agency of the individual who enters into it. But it is clear that the power of considering whether he ought to do it or not, whether it is prudent to do it or not, is altogether taken away from a father who is brought into the situation of either refusing, and leaving his son in that perilous condition, or of taking on himself the amount of that civil obligation. I have, therefore, my Lords, in that view of the case, no difficulty in saying that, as far as my opinion is concerned, the security given for the debt of the son by the father under such circumstances, was not the security of a man who acted with that freedom and power of deliberation that must, undoubtedly, be considered as necessary to validate a transaction of such a description." Hence, I cannot but repeat the question: "The question, therefore, is whether a father (a wife), appealed to under such circumstances to take upon himself (herself) the amount of civil liability, with the knowledge that unless he (she) does so his son (her husband) will be exposed to a criminal prosecution with the certainty of conviction, can be regarded as a free and voluntary agent?"

A case involving the same principles was considered in the New York court of errors and appeals. *Eadie* v. *Slimmon, 26 N. Y. 9.* The action was to recover $2,000 on a life insurance policy. It appeared that on the 4th day of April, 1857, Slimmon went to the house of Mr. Eadie with an attorney, a person whom he represented to be a police officer, and another person, and there accused Eadie of having embezzled money while in his employment as a clerk. An altercation ensued between them as to the amount of Eadie's indebtedness. Slimmon demanded that Eadie should convey to him his house, and cause the policy of insurance upon his life, held by Mrs. Eadie, to be assigned to him, in payment or security for the alleged indebtedness. The discussion lasted some hours. Mrs. Eadie was either present or near by all the while. Slimmon threatened that, if Eadie would not comply with his demands, he

Lomerson v. Johnston.

should be prosecuted criminally for embezzlement, and stated that he had an officer in attendance for that purpose, and said he would take the responsibility. A brother-in-law of Mrs. Eadie's called, and found her in a state of great excitement. He intervened in the discussion, at her request, and finally, about two or three o'clock in the morning, her agitation and distress continuing, he advised her to execute an assignment of her policy, and persuaded Eadie to unite in it, and also in an agreement to convey his house. A memorandum in writing to that effect was entered into. At about ten o'clock of the succeeding forenoon, the formal assignment of the policy was executed by Mrs. Eadie and her husband. At the trial in court this assignment was declared to be of no binding force. Upon appeal, to the supreme court, the judgment below was reversed. In the court of errors, the latter judgment was reversed, and it was said: "As between parties occupying no relation of confidence in or towards each other, or of control, by reason of position, employment or otherwise, undue influence can rarely be imputed without showing some degree of fear, or threats, or advantage taken of position, or unfair practices or persuasion, involving in some degree a species of fraud. But when any of these elements enter into and constitute part of the circumstances attending a transaction, and controlling the will of a party making a deed or other contract, courts of equity have long been accustomed to give relief. Judge Story states the rule, as extracted from and confirmed by many cases, as follows: 'Courts of equity,' he says, 'relieve a party when he does an act or makes a contract when he is under the influence of extreme terror, or of apprehension short of duress; for in cases of this sort he has no free will, but stands *in vinculis*. (*1 Story Eq. Jur.* § *239*). Circumstances,' he says, 'of extreme necessity or distress of a party, although not accompanied by any direct duress or restraint, may also overcome free agency, and justify the court in setting aside the contract on account of some attending oppression.' * * * The rules in regard to the doctrine of undue influence have been asserted in numerous cases in our own courts. (*Whelan* v. *Whelan, 3 Cow. 537;*

*Sears* v. *Shafer, 1 Barb. 44; S. C., 2 Seld. 272; Howell* v. *Ransom, 11 Paige 538; Ellis* v. *Messervie, Id. 467; 5 Denio 640)."*

"Within the principle asserted in these cases, the present case presents, I think, an instance of a contract procured by undue influence, if one ever existed. The assignment from the plaintiff to the defendant was most clearly extorted by a species of force, terrorism and coercion which overcame free agency; in which fear sought security in concession to threats and to apprehensions of injury. It was made as the only way of escape from a sort of moral duress more distressing than any fear of bodily injury or physical constraint." The testimony shows that Eadie himself refused, and that Slimmon told him "that if he did not, as sure as the sun rose, he would lodge him in yonder jail to-morrow; he had an officer down stairs for that purpose." Many other similar observations were made by Slimmon. The court said : " I can imagine no duress over a man—no restraint over his person, or dread of personal injury—more likely to deprive him of free agency, and induce him to yield to the wishes and demands of another, than the duress over this woman, operating through appeals thus addressed to her pride, her fears, her affections and her sensibilities."

The principle upon which the court of equity proceeds in these cases seems to be further illustrated by that of *Rau* v. *Von Zedlitz, 132 Mass. 164.* The suit was in equity. The bill alleged that the defendant was indebted upon two drafts accepted by her at Dresden on the day previous to her marriage, and seeks to obtain a decree that the trustee of the marriage settlement shall apply to the payment of the drafts, so much of the trust fund as is necessary. The defence is that the acceptance of the drafts was forced upon her by threats and undue influence, and is invalid. It seems that the defendant whilst traveling in Europe became engaged to be married. She possessed considerable fortune in her own right, and a marriage settlement was prepared at her request. Her intended husband was largely indebted to the plaintiff, and there was some evidence that portions of the money had been advanced by the plaintiff; and the defendant was induced to go to the office of a notary public to make some

Lomerson *v.* Johnston.

arrangement about the money which her intended husband's mother informed her he owed the plaintiff. She went, accompanied by her intended husband and his mother, and found there another creditor. An interpreter was present during the interview, which continued from five o'clock until eight. She was told that her intended husband was indebted in the sum of fifteen thousand marks, and was requested to sign drafts to that amount. She refused, saying that it was impossible, and that she had parted with all her property. She was solicited again and again to sign, and was told, by her intended mother-in-law, that if she did not, disagreeable consequences would follow; and that unless the drafts were signed, the marriage on the following day would not take place. She was also told that the police would prevent their leaving their dwelling, or would stop them at the door of the church, and that the whole affair would be published in the newspapers. It also appears from the testimony of the plaintiff that he meant to have her intended husband arrested unless she paid the debt. She desired to leave the room, and was told that she could not go until the matter was arranged. Neither of the parties could speak a language which the other could understand. The mother-in-law was particularly interested, and was very desirous that the defendants should sign the drafts. The defendant was very much excited, and at last, with tears, she fainted, after which the first she knew was that her intended husband was holding her at the window and offering her a glass of water, when her intended mother-in-law said to her: "Now, you had better sign," and she did so. Upon these facts, the court say: "The contract she entered into was without consideration, and it was purely a question of fact, whether she was induced to sign it by threats and undue persuasions, and through fear that her marriage would be prevented. This in equity will constitute a good defence to the bill."

The same principles are announced in *Lyon* v. *Tallmadge, 14 Johns. 501, 513; Lamplugh* v. *Cox, 1 Dick. 411; Davies* v. *London and Provincial Ins. Co., L. R. (8 Ch. Div.) 469; Sharon* v. *Gager, 46 Conn. 189; Reed* v. *Exum, 84 N. C. 430; Singer Mfg. Co.* v. *Rawson, 50 Iowa 634; Thurman* v. *Burt, 53 Ill. 129; Har-*

Lomerson *v.* Johnston.

*shaw* v. *Dobson, 64 N. C. 384; Harris* v. *Carmody, 131 Mass. 51; Smith* v. *Allis, 52 Wis. 337.*

So far as I have observed in no one of the cases which I have considered up to this point has the instrument alleged to have been procured by oppression been solemnized by an acknowledgment of its free and voluntary execution, according to the statute in such case made and provided, by a public officer authorized to take such acknowledgment, except that of *Sharon* v. *Gager.* We are not, however, left without the aid of a judicial examination of the subject with such an important fact in the case. In *Central Bank of Frederick* v. *Copeland, 18 Md. 305,* the court was called upon to deal with the subject thus presented. The mortgage was given by Copeland and his wife upon the real estate of the wife. There was an acknowledgment and separate examination of the wife duly certified by the officer authorized to take such acknowledgments. Upon proceedings to foreclose, a decree *pro confesso* was taken against the husband. Mrs. Copeland, under leave, answered separately, showing that, at the time of the execution of the paper, she was in bed and suffering from a severe spell of sickness, and was weakened and much reduced by nervous prostration; and that, whilst in such a state of physical debility, she was forced to sign the paper in the presence of her husband by means of threats and menaces which she was unable to resist, and that the means used were fraudulent. The court find these allegations to be true, and say : " The execution of the mortgage was preceded by personal menaces and threats of her husband to destroy the property by fire, if she did not execute it, and the fact that it was executed and acknowledged involuntarily, as a consequence, cannot be doubted. The resort to measures thus violent and harsh, leads irresistibly to the conclusion, that her consent could not have been obtained otherwise. Her acknowledgment, that it was free and voluntary, and not induced by fear, as between the parties to the deed, is not conclusive of the fact that it was so, nor can it, with due regard to the evidence in the case, be so considered. * * * A husband, who, by extreme harshness, compels a wife to execute a deed of her property against her will, and then, in the form pre-

Lomerson v. Johnston.

scribed by law for her protection, to sanction the wrong inflicted by acknowledging its involuntary execution to be voluntary and without fear, cannot, by reason of the mere formal acknowledgment, entitle himself, nor any one in whose interest such a wrong may be attempted, to set up a claim upon the deed as a valid conveyance. As the execution and acknowledgment of the mortgage in this case by Mrs. Copeland appears to have been induced by harshness and threats, and the exercise of an unwarrantable authority, so excessive as to subjugate and control the freedom of her will, the aid of this court to support and enforce its provisions against her must be refused."

In the case of *Sharon* v. *Gager, supra,* the treasurer of a town became a defaulter, and the selectmen of the town urged an aunt of this treasurer to secure the amount due by a mortgage on her lands. She had lived with the nephew for many years and was greatly attached to him. An agent of the selectmen said to her, "You know what the consequence is—it is $500 fine and imprisonment." The aunt executed and acknowledged a mortgage on her real estate. The court held that she could avoid it.

In *McCandless* v. *Engle, 51 Pa. St. 309,* the court said: "Less than actual duress will avoid an acknowledgment of deed of conveyance or mortgage by a wife, provided it be known to the party claiming through it.  *   *   *   It is enough if it be shown that the wife did it under moral constraint, that is by threats, persecution and harshness of her husband to force her to set aside her own free will." *Michener* v. *Cavender, 38 Pa. St. 334; Louden* v. *Blythe, 16 Pa. St. 532; Harris* v. *Carmody, 131 Mass. 51.*

The case of *Remington* v. *Wright, supra,* is not in conflict with the views of the learned judges expressed in the cases cited, otherwise than is so frequently the conflict between cases at law and in equity, which conflict is the principal seat or throne of equity. And this distinction is fully recognized by Mr. Justice Reed, who delivered the opinion in the last-named case.

Therefore, it is plain, that pressure which does not amount to duress at common law, may be considered, in equity, as sufficient

to set aside, or to resist, a contract. Whenever a contract is procured by such influences as overcome the free agency of the contracting party, whether parent or child, husband or wife, such influences afford an equitable defence. To this end all the cases unerringly and unwaveringly tend.

And, that the undoubted statement of facts in the case before me bring it within these principles, requires but little argument. Mr. Lomerson demanded the mortgage of Mrs. Johnston to secure the debt of her husband, and informed her of the criminal liability of her husband. Now, Mrs. Johnston and her daughter both swear that Mr. Lomerson said that proceedings had already been begun by those interested, against her husband. This, Mr. Lomerson denies. Now, while he may not have so expressed himself, it is quite impossible for me to believe that some allusion was not made to proceedings pending or anticipated. Persons so little acquainted with court transactions would not be likely to manufacture such statements, however much they might become confused in the repetition of such statements. But, at all events, the question of criminal liability must have been introduced by Mr. Lomerson, and it must have been for a purpose, and that purpose must have been to get Mrs. Johnston to join in the mortgage. He went there for that purpose, and he made, as his own testimony most clearly shows, the very most of the fact, in order to produce the desired effect on her mind. I can conceive of nothing, in such cases, more likely to overcome free agency.

I think the defendant is entitled to the benefit of her defence, and that the bill of complaint should be dismissed, with costs.