W. W. FLYNT et al. *vs.* THE J. WATERMAN COMPANY.

Piscataquis. Opinion December 19, 1923.

*Ordinarily the claim of duress per minas must be sustained by threats which create a reasonable fear of loss of life or of great bodily harm or of imprisonment of the person to whom the threats are made, but there are exceptions to this rule based upon the nearness and tenderness of family relations and the obviously restraining force of family ties, and the exception may include the case of father and son.*

In this case the facts when carefully analyzed do not show that the plaintiffs have sustained the burden of proving that the confession of the son as to embezzlement was obtained by duress and threats of criminal prosecution.

Nor have they sustained the burden in proving that they themselves paid the money by reason of threats of the criminal prosecution of the party who was the son of one plaintiff 'and the nephew of the other.

In addition to other evidence in favor of the defendant, the fact that while the alleged acts took place on June 28 and 29, 1911, no complaint was made nor suit brought until June 26, 1917, just three days before the action would be barred by the statute of limitations is of compelling significance.

On report. An action for money had and received claimed to have been paid by plaintiffs under duress. A, a son of one of the plaintiffs B, and a nephew of the other plaintiff C, confessed to embezzlement from the defendant, and the plaintiffs paid to defendant one thousand dollars to reimburse him on July 3, 1911, the confession having been made a few days prior thereto, on June 28, 1911. On June 26, 1917, this action was brought alleging that the money was paid under duress and threats of criminal prosecution of the party who confessed to the embezzlement. By agreement of the parties at the conclusion of the testimony the cause was reported to the Law Court. Judgment for the defendant.

The case is stated in length in the opinion.

*C. W. & H. M. Hayes,* for plaintiffs.

*George E. Thompson,* for defendant.

SITTING: CORNISH, C. J., HANSON, PHILBROOK, MORRILL, WILSON, JJ.

CORNISH, C. J.   Action for money had and received brought on June 26, 1917, to recover the sum of $1,000 (and interest) alleged to have been paid to the defendant on June 29, 1911, under duress. The case is before the Law Court on report.

The material facts upon which there is no disagreement are briefly as follows: J. Curtis Flynt had been in the employment of the defendant, a retail clothing concern in Bangor, as clerk in the shoe department for about one year prior to May, 1911, when he left and went to Augusta as clerk for another retail shoe dealer.

After Flynt's departure the defendant suspecting that money had been taken by some of the clerks in the shoe department employed one Ripley, a detective, to investigate.   Ripley enlisted the services of the Bangor police who placed one Oleson under arrest, and Mr. Knaide, then Inspector of Police, telephoned Curtis Flynt to go to Bangor, which he did on the evening train of June 28, 1911.

On arrival a conference was held at a hotel, between Curtis Flynt and the officers and detective and Mr. A. J. Waterman of the defendant company, which resulted in Curtis' writing and delivering to Mr. Waterman the following confession:

"June 28, 1911.

I acknowledge of my own free will that I have stolen money from J. Waterman Co. at various times from June, 1910, to the time I left about May 25, same varying from $12 to $20 per week, and I am willing to make settlement to J. Waterman Co. for any amount proven against me, but I think the above statement amply covers the amount.

(Signed) J. C. FLYNT.

Witnesses:
    J. L. RIPLEY,
    A.  J. WATERMAN,
    CALVIN KNAIDE,
    T. E. O'DONOHUE."

Curtis was then taken to the police station at City Hall and allowed to telephone to Dover to request the plaintiffs, his father and his uncle, to come to Bangor the next morning. He was then locked up for the night. The next morning the plaintiffs arrived in Bangor about 9:00 or 9:30 and had conferences with the interested parties and also with an attorney who prepared some writing in the nature of a note or agreement whereby the plaintiffs agreed to pay the defendant the sum of $1,000. This was paid on July 3d, and the following receipt given:

"Bangor, Maine, July 3, 1911.

For one dollar and other valuable considerations received by J. Waterman & Co. paid by W. W. Flynt and others we hereby release J. C. Flynt from all claims or demands which we may have against him for any cause whatsoever.

J. WATERMAN CO.
By A. J. WATERMAN."

This is a mere outline of occurrences concerning which there is no serious controversy, but the various acts and words leading up to the consummation of the agreement between the parties and the payment of the money raise sharply contested questions of fact.

The principle of law invoked by the plaintiffs as the foundation of their right of recovery is that they were induced by threats of the prosecution and imprisonment of Curtis Flynt, the son of one plaintiff and the nephew of the other, to make this payment, that therefore it was made under duress, and the amount so paid can be recovered with interest.

Ordinarily the claim of duress per minas must be sustained by proof of threats which create a reasonable fear of loss of life or of great bodily harm or of imprisonment of the person to whom the threats are made. It is a personal matter and one person cannot ordinarily avoid an obligation or recover money paid by reason of duress to another. For instance, this claim is not open to sureties where duress has been practiced on the principal. *Robinson* v. *Gould*, 11 Cush., 55; *Oak* v. *Dustin*, 79 Maine, 23. But there are exceptions to this rule based upon the nearness and tenderness of

family relations and the obviously constraining force of close family ties. Thus the exception has obtained in case of intended husband and wife, *Rau* v. *Von Zedlitz,* 132 Mass., 164; of husband and wife, *McMahon* v. *Smith,* 47 Conn., 221; *Harmon* v. *Harmon,* 61 Maine, 227 at 231; of parent and child, *Harris* v. *Carmody,* 131 Mass., 51; *Bryant* v. *Peck and Whipple Co.,* 154 Mass., 460; *Stevens* v. *Thissell,* 240 Mass., 541; of aunt and nephew, *Sharon* v. *Gaher,* 46 Conn., 189; of brother and sister, *Kronmeyer* v. *Buck,* 258 Ill., 586, and see 9 R. C. L., Page 726-7 and examples given.

Conceding for the purposes of this case the application of this exception here, if the evidence warrants, we must determine as a matter of fact first whether the confession of Curtis Flynt was obtained by duress and threats of criminal prosecution, and second whether the money was paid by the plaintiffs also by reason of threats of prosecution and imprisonment of Curtis.

On these points the evidence in contradictory and the burden of proof is on the plaintiffs.

The testimony of Curtis as to what took place on the evening of June 28th, 1911, is extravagant to the verge of recklessness. He attempts to make out that the detective and the officers in the presence of Waterman wrung from him this confession against his protestation of innocence by all illegitimate methods possible; that they called him a liar, that they threatened that unless he made some kind of a statement acknowledging the taking of money and promise to repay, they would hold court the next day and railroad him to Thomaston, that the court and Judge were all there and they would railroad him to Thomaston before the next night; that in consequence of all these threats his will was overcome and he first wrote out a statement acknowledging the purloining of $500. That Waterman said that was not enough and instructed his agents to try and get more. That they came back to him and, to quote his words, "the detective sat down in front of me and says: 'Now you want to do this thing right and make it enough this time, we know how much it was,' and he took out a pair of handcuffs and he sat there in front of me jingling those handcuffs." In consequence of these threats Curtis testified that he made and signed this confession already quoted. In itself this statement bears the impress of unreliability. It stands uncorroborated.

In all its terrorizing features it is flatly contradicted by both Mr. Waterman and Mr. Knaide. They both say that when faced with the accusation Curtis at first denied it and appeared surly and unwilling to talk, but finally he admitted the theft and himself wrote the confession; that not two confessions of different amounts were written, but only this one; that no talk about railroading him to Thomaston was used, nor were any handcuffs dangled before him. In short these witnesses declare that it was as it purports to be on its face, a voluntary confession. These witnesses were Mr. Waterman of the defendant company, a prominent business man of Bangor, and Mr. Knaide then Inspector of Police, now Chief of Police, and connected with the department for forty years. Their testimony commends itself to the reader. The detective is blind and unable to appear in court. In the second place the confession written by Curtis and signed by him states that it is made of his own free will and that he is willing to make settlement for any amount proven. Not a word is said about immunity from prosecution or arrest. Restitution was apparently the matter chiefly under consideration.

Another point strongly militating against the truth of his statements we will consider later. It is sufficient to say that on the whole the plaintiffs have not sustained the burden of proof on the question of the confession being made under duress.

But the son did not bring this action. The plaintiffs are the father and uncle who paid the money, the former $600 and the latter $400. For what did they pay it? Was it to prevent the prosecution and imprisonment of Curtis and under threats on the part of the defendant and its agents that unless they did pay this sum he would be sent to State Prison, and were their wills overcome by these intimidations so that the payment was involuntary on their part, or was it a voluntary payment of what was due from the young man to the Waterman Company by way of restitution of money purloined, the discharging of a civil liability independent of any criminal action whatever?

The plaintiffs claim the first to be the true situation, and again the burden is on them to prove it, and again in our opinion the evidence fails to substantiate the contention.

The plaintiffs were men of mature years, with the experience which maturity brings. They themselves saw the situation. The young man had signed the confession. True he says he claimed to

them that he was innocent and had executed it because in fear of imprisonment, and they testify that they were actuated by the same motive in making the written promise on June 29th to pay the $1,000 and later, on July 3d, in paying that sum.

On the other hand it appears from Mr. Waterman's testimony that when he met the plaintiffs that morning they expressed deep regret that the young man had gone wrong and "wanted to return any money that he had stolen." That he then consulted an attorney as to his rights and duties and in consequence of that consultation he made the agreement of settlement with the plaintiffs with the distinct understanding that he would not agree not to prosecute. It was a matter of restitution, not of compounding a felony.

Then the plaintiffs consulted an attorney and employed him to draw up the agreement of settlement, which he did. That is not in evidence. It was made on June 29, and probably destroyed on July 3, when its terms were complied with by the payment of the money. Their attorney closed the transaction for them by paying the money which they sent him and by obtaining from the defendant the receipt acknowledging full payment of all demands and sending it to them.

Mr. Waterman further denies all threats or attempts at intimidation toward these plaintiffs as claimed by them, and in this he is fully corroborated by Mr. Knaide. There was neither blackmailing nor extortion.

But the strongest piece of evidence in favor of the defendant's contention is the fact that while the alleged duress took place on June 28 and June 29, 1911, this suit was not instituted until June 26, 1917, just three days before it would be barred by the statute of limitations. If the occurrence took place as the plaintiffs now declare, the enormity of it and the terrorizing conduct of the defendant and its agents must have created such a profound impression upon their minds that they would have been likely to seek immediate redress for the wrong done them, at least as soon as they got out from under the wicked influence. Not many days would have passed before they would have sought to obtain their legal rights. Yet they went back to Dover on June 29, and five days elapsed between the signing of the alleged involuntary agreement and the payment of the $1,000 called for thereby. No word of protest was then uttered. Payment was made and receipt given. And five years, eleven months and

twenty-six days passed by, a total of 2,187 days, before they awoke to a realization of how badly they had been treated, how their wills had been overpowered, and their rights trampled upon. In the meantime they had remained absolutely silent. Not a single demand or request had been made upon the defendant to restore its illgotten gains. The service of the writ was the first and only notice, or even suspicion, of the claim. Moreover that service was made on June 27, only two days before the statute of limitations became effective, and then it was so late that Curtis Flynt was practically immune from any prosecution, not by reason of any agreement on the part of the defendant as the inducement of the plaintiffs payment, but by reason of the same statute of limitations. That statute in effect then barred any criminal prosecution of the young man, but not the plaintiff's action which was begun at a most opportune time. The compelling force of this long, long delay, added to the other evidence for the defense, more than meets the evidence for the plaintiffs. The serious charges are not sustained and the entry must be,

*Judgment for defendant.*