[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 11 
As between parties occupying no relation of confidence in or towards each other, or of control, by reason of position, employment or otherwise, undue influence can rarely be imputed without showing some degree of fear, or threats, or advantage taken of position, or unfair practices or persuasion, involving in some degree a species of fraud. But when any of these elements enter into and constitute part of *Page 12 
the circumstances attending a transaction, and controlling the will of a party making a deed or other contract, courts of equity have long been accustomed to give relief.
Judge STORY states the rule, as extracted from and confirmed by many cases, as follows: Courts of equity, he says, relieve a party "when he does an act or makes a contract when he is under the influence of extreme terror, or of apprehension short of duress; for in cases of this sort he has no free will, but standsin vinculis." (2 Story Eq. Jur., § 239.) Circumstances, he says, of extreme necessity or distress of a party, although not accompanied by any direct duress or restraint, may also overcome free agency, and justify the court in setting aside the contract on account of some attending oppression, fraudulent advantage or imposition.
The civil law, from which, in a large degree, we derive the principles which control courts of equity, always sets aside a contract procured by force or fear, or want of liberty in regard to it. (Digest, lib.4, tit. 2, § 1.) But it was said the party must be intimidated by the apprehension of some serious evil of a present or pressing nature, and such as is capable of making an impression upon a person of courage. But Pothier thinks this rule too strict, and that "regard should be had to the age, sex and condition of the parties," and that "a fear which would not be deemed sufficient to have influenced a man in the prime of life and of a military character, might be sufficient in respect to a woman or a man in the decline of life." (Pothier on Obligations, Evans, p. 16, art. 3, §§ 2, 25.)
The rules in regard to the doctrine of undue influence have been asserted in numerous cases in our own courts. (Whelan v.Whelan, 3 Cow., 537; Sears v. Shafer, 1 Barb., 44; S.C.,
2 Seld., 272; Howell v. Ransom, 11 Paige, 538; Ellis v.Messervie, id., 467; 5 Denio, 640.)
Within the principle asserted in these cases, the present case presents, I think, an instance of a contract procured by undue influence, if one ever existed. The assignment from the plaintiff to the defendant was most clearly extorted by a species of force, terrorism and coercion which overcame free agency; in *Page 13 
which fear sought security in concession to threats and to apprehensions of injury. It was made as the only way of escape from a sort of moral duress more distressing than any fear of bodily injury or physical constraint. Mr. White, the plaintiff's brother-in-law, called at Eadie's on his return from an evening meeting, and there found the defendant and his counsel, a police officer and another man. This, I should presume, from the season of year (April 4th), could not have been later than 9 o'clock. How long these persons had been there at that time does not appear. The defendant and his counsel were in an upper room, and the officer and the man with him in the parlor below. The witness was requested by Mrs. Eadie to go into the drawing-room where the defendant was, who was talking very loudly and had some difficulty with her husband.
The witness immediately was informed what the difficulty was. The defendant insisted that Eadie should make over to him his house, and that an assignment of this policy should also be made. "Eadie refused. Slimmon told him that if he did not, as sure as the sun rose to-morrow he would lodge him in yonder jail; he had an officer down stairs for that purpose." The plaintiff was sent for and came in immediately. The matter was talked over, and much discussion ensued. Mr. Eadie refused to make an assignment of the policy. Slimmon then renewed his threats to arrest Eadie if the policy was not assigned. Mrs. Eadie became much excited, and appeared about to go into hysterics. In the course of the conversation the plaintiff said to the defendant, "Mr. Slimmon, surely you won't take away my husband." He said "he was sorry that he was compelled to do it." Finally this woman consented, and about 3 o'clock the next morning the memorandum of agreement to assign the policy and settle the matter was executed by her and her husband. After about six hours of continuous altercation and angry discussion between Eadie and Slimmon, of excitement and distress on the part of the plaintiff, the defendant had accomplished his purpose. Through this period of time the fears and sensibilities of this woman *Page 14 
were worked upon by threats of a criminal prosecution which should consign her husband to prison, involving great mortification, shame, distress and ruin to herself and family, and the wife finally yields to the demands of her husband's creditor.
I can imagine no duress over a man — no constraint over his person, or dread of personal injury — more likely to deprive him of free agency, and induce him to yield to the wishes and demands of another, than the duress over this woman, operating through appeals thus addressed to her pride, her fears, her affections and her sensibilities. A deed executed at such a time, under such circumstances, should be deemed obtained by undue influence, and ought not to stand.
It is conceded in the opinion of the learned judge in the court below, that this must be so if the transaction had been terminated at this interview; but it was held that, inasmuch as the assignment was not then executed, time was given for the plaintiff to become tranquil and act freely, and that the final assignment was not executed till after the lapse of sufficient time for that purpose. The formal assignment was executed about 1 o'clock the next day; but can there be any doubt that when it was so executed the plaintiff was still acting under the influence of the same apprehensions and fears which led her to consent to make the assignment during the night before? But she had in fact made a written assignment, valid in law if the policy was assignable by her, if she had made no other. The assignment executed the next day was a mere formality. She was applied to by the same counsel for the defendant who had been present during the previous night and was familiar with all that then occurred; and, having consented to transfer the policy, and being thus committed to complete the assignment, she obviously knew not how to avoid it, or otherwise to escape from the strait in which she was placed. I think the execution of the formal assignment then made should be deemed part and parcel of the original transaction, and to be governed by the same influences and considerations which controlled her signature of the memorandum a few hours before. The *Page 15 
threats of the arrest and imprisonment of her husband were still fresh in her mind, and the same apprehensions for his sake and her own, of shame, mortification and ruin, still stared her in the face. Another consideration, I think, should exert some influence in the decision of this question. Either the accusation which the defendant brought against Eadie was entirely unfounded, or he was seeking to compromise a criminal offence. If he knew that a crime had been committed by Eadie, he had no right to compromise it in this way, and the securities obtained upon such compromise were received as a consideration for compromising a felony, and for that reason were invalid; else the whole of his assertions and threats on the subject were a gross imposture. A majority of my brethren also think that the policy of insurance was not assignable by Mrs. Eadie. The policy was issued and taken under the act of 1840, entitled, "An act in respect to insurance of lives for the benefit of married women." We think the intent of the statute was to make these policies a security to the family of any married man, and a provision for their use and benefit, and that this intent would be defeated if they were held to be assignable by the wife like ordinary choses in action belonging to her in her own right as her separate property.
The judgment of the general term should therefore be reversed, and that of the special term affirmed, with costs.
DENIO, J., concurred in the judgment on the ground last stated. The other judges concurred on both grounds, except SELDEN, Ch. J., who was absent, and WRIGHT, J., who dissented from both the positions of the preceding opinion.