## JAEGER v. KOENIG.

(Supreme Court, Appellate Term. February 23, 1900.)

1. CONTRACTS—DURESS—THREATS.
   Where plaintiff's husband was accused of stealing defendant's property, and plaintiff paid a certain sum to defendant under fear excited by his threats that unless she did so her husband would be imprisoned, she was entitled to recover the amount, as being paid under duress.

2. SAME—EVIDENCE.
   Plaintiff testified that she visited defendant to ascertain why her husband had quit his employ, and was told that he had stolen from defendant, and that detectives were going to have him imprisoned, but that, if she paid, it would .go no further; that next day, pursuant to an arrangement, she called again, and defendant said that he would be satisfied with $400; that she told him she would bring the money, and at evening she paid him, and signed a paper, and was told. that everything was all right now, if her husband kept quiet. *Held* to sustain a finding that the payment was made under duress.

3. SAME—HUSBAND AND WIFE—AGENCY.
   Where defendant had threatened the arrest of plaintiff's husband for theft unless she paid a certain sum, it. was no defense to an action to recover the sum so paid that it was paid in a settlement with defendant's wife, since the defendant, having received the money, could not repudiate the agency.

4. SAME—COMPOUNDING FELONY.
   Where the plaintiff's husband was accused of stealing from defendant, and plaintiff paid money in settlement while under duress, the recovery of such sum could not be defeated on the ground that the payment was compounding a felony, when no criminal action had been contemplated.

5. WITNESS—CROSS-EXAMINATION.
   Defendant sought to show on cross-examination of plaintiff that she had testified falsely in another action regarding matters foreign to the case at bar. *Held*, that such testimony was properly excluded.

6. SAME—EVIDENCE.
   Inquiries to plaintiff on cross-examination as to a conversation had with her husband before visiting an attorney, and as to whether her husband on such visit talked of instituting an action against the defendant, in order to show the husband to be the real party in interest, were properly excluded, the nature of the action inquired about not being shown.

Appeal from city court of New York, general term.

Action by Marie Louise Jaeger against John H. Koenig. From a judgment of the general term of the city court of New York affirming a judgment in plaintiff's favor (61 N. Y. Supp. 505), defendant appeals. Affirmed.

Argued before BEEKMAN, P. J., and GIEGERICH and O'GORMAN, JJ.

George H. Hart, for appellant.
Samuel Scoville, Jr., for respondent.

GIEGERICH, J.   The action is to recover $300, claimed to have been obtained by the defendant from the plaintiff through threats, coercion, and undue influence, under circumstances hereinafter stated.   The answer admits the receipt of said sum, and, for a further defense, alleges that it, together with a promissory note for $100, was given in settlement of an action in the city court of New York brought by the defendant against plaintiff's husband "for larceny of divers sums of money, wines, and cigars, etc., to the amount of $2,000 damages"; that when such action was settled the summons, with notice, had been issued, the affidavit to obtain an order of arrest sworn to, the undertaking to procure such order signed by the defendant, and a retainer paid by the latter to his attorney. The issues were by consent referred to a referee for hearing and determination.   The only witnesses who testified upon the reference were the plaintiff and her husband, the defendant putting in no proofs.   The referee, among other things, found that on the 8th day of November, 1896, the husband of the plaintiff was in the employ of the defendant as a bartender, and was accused by the latter of having stolen a half dollar; that the sum in suit was the private property of the plaintiff, and was paid by her because of defendant's threat that in the event of her failure to pay it her husband would be locked up; and that such sum was not paid voluntarily, but under duress, and because of the fear of defendant's executing said threat. The defendant separately excepted to each finding of fact and to the conclusion of law of the referee.   Judgment in favor of the plaintiff was rendered upon said report, which was sustained by the general term of the city court of New York, and the defendant appealed therefrom to this court.

It is urged that all the findings made and the conclusion reached by the referee are erroneous; but, after carefully reading the record, I am convinced that they are in every respect warranted by the evidence.   Upon the facts as found by the referee, the judgment is amply sustained, according to the authorities.   Eadie v. Slimmon, 26 N. Y. 9; Schoener v. Lissauer, 107 N. Y. 111, 13 N. E. 741; Adams v. Bank, 116 N. Y. 606, 23 N. E. 7, 6 L. R. A. 491; Williams v. Bayley, L. R. 1 H. L. 200; Davies v. Insurance Co., 8 Ch. Div. 469; Harris v. Carmody, 131 Mass. 51; Jordan v. Elliott, 12 Wkly. Notes Cas. 56; Coffman v. Bank, 5 Lea, 232; Bank v. Kusworn, 88 Wis. 188, 59 N. W. 564, 26 L. R. A. 48; Lomerson v. Johnston, 44 N. J. Eq. 99, 13 Atl. 8.   The first case cited is a leading one in this state upon the question under consideration.   There the action was brought to recover the amount due under a policy of insurance upon the life of the plaintiff's husband; the insurers depositing the money in court, and leaving the contest between the widow and the defendant, who claimed under an assignment from the wife, but which she averred to be void, as having been obtained by coercion, and threats of prosecuting her husband for an embezzlement.   Smith, J., in delivering the opinion of the court, said (pages 12–14):

"The assignment from the plaintiff to the defendant was most clearly exacted by a species of force, terrorism, and coercion which overcame free agency, in which fear sought security in concession to threats and to appre-

hensions of danger. It was made as the only way of escaping from a sort of moral duress more distressing than any fear of bodily injury or physical restraint. * * * A deed executed at such a time, under such circumstances, should be deemed obtained by undue influence, and ought not to stand."

These principles were applied in Schoener v. Lissauer, supra, where a bond and mortgage were obtained from a mortgagor by a threat that, unless they were given his son, who was charged with embezzlement, would go to state prison. The mortgage was set aside, and the judgment was, upon appeal, affirmed by the court of appeals. The facts of this case are stated in greater detail in the consideration of another branch of the case at bar. In Adams v. Bank, supra, payment by a wife of her husband's debt, induced by threats of his arrest on the eve of his departure for Europe, because of her fear of its effects on his shattered and feeble health, was held to be made under such undue influence as entitled her to recover back the money paid, notwithstanding that there was lawful ground for such arrest. Brown, J., in giving the opinion of the court, elaborately reviewed the authorities, and in the course thereof said (page 611, 116 N. Y., page 8, 23 N. E., and page 494, 6 L. R. A.):

"It is not an accurate use of language to apply the term 'duress' to the facts upon which the plaintiff seeks to recover. The case falls rather within the equitable principle which renders voidable contracts obtained by undue influence. However we may classify the case, the rule is firmly established that, in relation to husband and wife or parent and child, each may avoid a contract induced and obtained by threats of imprisonment of the other, and it is of no consequence whether the threat is of a lawful or unlawful imprisonment."

The case of Williams v. Bayley, supra, appears to be the leading English one upon the subject. There a son of the plaintiff carried to bankers, of whom he, as well as his father, was a customer, certain notes, with the latter's name upon them as indorser. These indorsements were forgeries, and on one occasion the plaintiff's attention was called to the fact that a promissory note purporting to be indorsed by him was lying at the bank, dishonored. He apparently communicated the fact to his son, who immediately redeemed it. There was no distinct evidence to show whether or not the plaintiff understood the nature of the transaction. Afterwards the fact of the forgery was discovered, and the son failed to deny it. Thereupon the bankers insisted, though without direct threats of prosecution, that the plaintiff should become a party to a settlement, to which he consented by executing an assignment to make an equitable mortgage on his property. The notes, with the forged indorsements thereon, were then delivered up to him. The agreement was held to be invalid, and the decree was affirmed by the house of lords. While in the opinion of Lord Westbury it is explicitly stated that an agreement for "stifling" a criminal prosecution affords sufficient grounds for holding the agreement void, the opinions of his associates are based mainly on the ground of undue pressure. The doctrine of this case has been recognized and applied in numerous cases arising in this country, among which are the two last mentioned, and others which will be hereinafter cited. In Harris v. Carmody, 131 Mass. 51, it was held that a father may avoid a mortgage which

he was induced to execute by threats of the prosecution and imprisonment of his son. The court, through Morton, J., said:

"At common law, as a general rule, the defense of duress per minas must be sustained by proof of threats which create a reasonable fear of loss of life, or of great bodily harm, or of imprisonment of the person to whom the threats are made; and one man cannot avoid his obligation by reason of duress to another. There is a well-settled exception to this rule in the case of a husband and wife, all the authorities agreeing that each may avoid a contract if it was made to relieve the other from duress. But the question whether this exception extends to the relation of parent and child does not appear to have been expressly adjudicated. But we find many dicta of judges, and statements of authors entitled to great respect, which show that from the earliest times it has been considered as the settled law that the relation of parent and child was within the exception."

What has been deemed to be the principal English case is cited in Lomerson v. Johnston, supra, where the mortgage was set aside because the creditors of the husband induced the wife to join with him in giving a mortgage on real estate to secure his debt, by telling her that the husband had been guilty of the crime of embezzlement, for which he could be imprisoned, and that another interested party had declared that he would see her husband in jail before he would do anything to relieve him.

None of the cases cited by the defendant have any application whatever to a case like the present one, where money has been obtained from the wife by threatening to imprison her husband. The distinction between this case and others where the contract is sought to be avoided by reason of the duress of the party seeking to avoid it is obvious. The distinguishing feature between the latter cases and a case where an agreement was procured by threats that a relative would be prosecuted is that the danger threatened must proceed from a third person. Thus, moneys paid by a plaintiff under a threat made to him by the defendant to sue or arrest him in a civil suit cannot be recovered (Dunham v. Griswold, 100 N. Y. 224, 3 N. E. 76; Day v. Manufacturing Co., 13 Misc. Rep. 320, 34 N. Y. Supp. 463); nor where they have been voluntarily paid by a father to compound a felony alleged to have been committed by his son (Haynes v. Rudd, 83 N. Y. 251; Id., 102 N. Y. 372, 7 N. E. 287). So, a threat on the part of the son to commit suicide does not in any legal sense constitute duress which would invalidate an instrument claimed to have been executed by his mother in consequence thereof. Insurance Co. v. Meeker, 85 N. Y. 614. And threats by a husband against his own life, whereby the wife is induced to sign a paper, do not constitute duress. Wright v. Remington, 41 N. J. Law, 48; Id., 43 N. J. Law, 451; Lefebvre v. Dutruit, 51 Wis. 326, 8 N. W. 149; Girty v. Oil Co., 1 App. Div. 224, 37 N. Y. Supp. 369. Nor does the threat of a widow to take her deceased husband's body for interment to a place not agreeable to his mother, unless the latter will acknowledge the execution of an assignment of an insurance policy previously executed by her, constitute duress. Jewelers' League v. De Forest, 80 Hun, 376, 30 N. Y. Supp. 88. The doctrine regarding the nullity of contracts procured by threats of prosecution of a relative is limited to such near relationships as those hereafter mentioned in the

rule deduced from the authorities, and has been held to not apply to the brother-in-law of a debtor. Solinger v. Earle, 82 N. Y. 393–400.

Reverting to the consideration of the main question, it would seem, from a careful reading of the adjudications above cited, and many others which might be quoted (see note to 26 L. R. A. 48 [s. c. 59 N. W. 564]), that the rule may be fairly stated to be, as expressed by Mr. Justice Brown, in Adams v. Bank, supra, "that, in relation to husband and wife or parent and child, each may avoid a contract induced and obtained by threats of imprisonment of the other," and that "it is of no consequence whether the threat is of a lawful or unlawful imprisonment." It should be added, however, that "it is not sufficient in such case to satisfy the trial court that the threats were uttered, but it must be shown that they constrained the will of the promisor, and so induced the promise." Dunham v. Griswold, 100 N. Y. 227, 3 N. E. 77; Sternback v. Friedman, 23 Misc. Rep. 173, 50 N. Y. Supp. 1025. Was, then, the money in suit obtained by undue influence? As seen, the sufficiency of the proof upon this head is directly challenged by the exceptions filed to the referee's report, and specifically to the findings and the conclusion therein contained. Hence it becomes necessary to refer to various passages of the evidence adduced in regard thereto.

On the 8th day of November, 1898, the husband of the plaintiff was in the defendant's employ as a barkeeper, and had been so employed for a period of two years and a half prior thereto. The defendant doubted his honesty, and he seems to have been aware of such suspicions. Two marked coins, of the denominations of 25 and 50 cents, respectively, were paid to him in his capacity as defendant's barkeeper on the 2d and 8th days of November by detectives in the defendant's employ. These moneys the plaintiff's husband failed to make returns for to the defendant, and he seeks to excuse his failure to do so on the ground that "it was marked money." On the afternoon of the last-mentioned day the plaintiff's husband, in the presence of one Horn and one Laurenson, denied defendant's accusation that he had stolen the 50-cent coin, and stated, as an explanation, that he had temporarily retained it to show that he was aware of defendant's efforts to entrap him. In the course of subsequent conversation, Horn stated that he was authorized by the defendant "to settle up" for $550, that being the amount the defendant claimed the plaintiff's husband had stolen from him during the period of his employment. This Jaeger disputed, and he declined to pay "one cent." Horn then suggested that he (plaintiff's husband) deposit with the defendant, as a guaranty that he would not "run away," the sum of $450, which he had in his possession, but which he claimed belonged to his wife. This Jaeger refused to do, saying that he had no intention of running away, and that, if the defendant had him locked up, "the court would decide who was right or wrong." Horn thereupon, according to plaintiff's husband's testimony, "went out, and was trying to have him arrested, for about a second," but returned and renewed the suggestion that he leave the money with defendant as security, which he again refused to do. He says that Koenig, the defendant, then dismissed him with the

remark that there was plenty of time on the morrow and the following day "to settle that thing." On the next morning the plaintiff went to the defendant's office, where, according to her testimony, the following conversation took place:

"I asked Mr. Koenig what the trouble was, that my husband quit his job so quick; and Mr. Koenig told me my husband had stolen fifty cents the day before, * * * and a quarter the Sunday before, * * * and a bottle of whisky, and the detectives was going to have my husband locked up; if I paid, it would go no further. * * * I was crying then, and I went home."

On the day after, the plaintiff and her husband were visited by Laurenson, previously referred to as having been present when Jaeger was accused of embezzlement, who, after saying that detectives were watching the house day and night to prevent plaintiff's husband from running away, urged the plaintiff to make a settlement with the defendant. Pursuant to an arrangement then made, the plaintiff called upon the defendant on the afternoon of that day, when this colloquy ensued, according to the plaintiff's testimony; defendant's wife and Laurenson being present:

"Mr. Koenig said that he lose $1,800 in his business so long as he has my husband working for him, and he called my husband a bad name. * * * Mr. Koenig asked me first what I was willing to do, and I says, 'Well, I don't know.' Laurenson says to Mr. Koenig, 'Are you satisfied with $400?' And Mr. Koenig says, 'Yes.' Laurenson asked me, 'What you think, Mrs. Jaeger?' I says: 'I don't know nothing about this business like this. I think yes, but I haven't got the money with me. I bring it this evening.' He did not at that time say that he would lock my husband up. When he said that he would be satisfied to take $400, I says, 'I haven't the money with me, but I will bring it this evening.' I went home. Laurenson went with me."

Accordingly, in the evening the plaintiff proceeded to the defendant's residence, and there met the latter, his wife, his son, his lawyer, a Mr. Derrickson, and Laurenson. She testifies:

"There was nobody with me. I was all alone. * * * Mr. Derrickson said to Mrs. Koenig, 'You sent up for me?' Mrs. Koenig says, 'Yes.' Derrickson asked what for, and Mrs. Koenig said, 'Mr. Jaeger, our bartender, had stolen 50 cents last Sunday, and a quarter the week before, and his wife is here to settle the matter.' I guess Mr. Koenig came in after that. He wasn't there at the time that Mrs. Koenig told Derrickson that. Mr. Derrickson * * * wrote out a receipt. So I asked what that meant,—'damages.' Mrs. Koenig told me. She says, 'That's all right.' Mr. Derrickson asked Mr. Koenig to sign the receipt, and Mr. Koenig did. I signed, Mr. Derrickson signed, and Laurenson signed. Then I put my money on the table,— $300. Mr. Koenig said he lose $1,800 in his business since he had my husband working, and he would settle the matter with me for $400. * * * Mrs. Koenig took the money. I said to Mr. Koenig, 'Well, everything is all right now?' Mr. Koenig said, 'If your husband keeps quiet now.'"

Upon cross-examination the plaintiff testified regarding Laurenson:

"I did not know Laurenson before the 9th [November]. * * * When he came to see my husband on the 10th, he told him that he was his friend. On the first visit he said that he came as my husband's friend."

The plaintiff's husband testified upon recross-examination that on the occasion when he was accused of larceny, and Horn went out to have him locked up, the defendant "told Mr. Laurenson not to let me go out." Further on he testifies regarding his acquaintance with Horn and Laurenson, by saying:

"He [Koenig] told me himself they were two detectives. * * * I told him I know that myself. * * * I told him I knew they were not printers. * * * I knew it because a man told me. I guess it was three or four days before election."

Now, can it be successfully claimed, in the face of the last-cited portions of the husband's testimony, and in view of Laurenson's zeal in seeking out and urging the plaintiff to make a settlement, and of his active participation in the negotiations which led up thereto, that Laurenson was in reality, as he professed to plaintiff, a friend of her husband? On the contrary, I think that his conduct is open to no other inference than that he was an active agent of the defendant throughout the entire transaction. Even assuming that I am in error regarding these views, and leaving out of consideration the entire testimony adduced pertaining to Laurenson's actions, except those which took place in the immediate presence of the defendant, the plaintiff's testimony is nevertheless amply sufficient, in my opinion, to warrant the inference that the threats so made by the defendant caused her such extreme terror and fear as to paralyze, for the time being, her will power, and that the money here sought to be recovered was paid to the defendant while the plaintiff was under the influence of such terror or fear, and while she was alone and without advisers. That such threat by the defendant made a serious impression upon her mind may well be gathered from the remark interrogatively addressed by her to the defendant when the money was paid over. The plaintiff was, as the testimony shows, an affectionate and loving wife, and consequently it was but natural for her to have been alarmed over the peril which she believed threatened her husband. Hence the anxiety manifested by her throughout the entire transaction to shield him from any harm. As was said by Bird, V. C., in Lomerson v. Johnston, 44 N. J. Eq. 99, 13 Atl. 12:

"It is happy for us that all persons, male or female, are blessed with these tender sensibilities which quickly respond when peril is threatened to friend, a child, a husband, or wife."

I fully agree with the learned referee that it is not necessary in these cases "to show any definite or precise method of duress," and that the question of duress must be decided upon all the facts and circumstances adduced upon the trial. From a consideration of the entire evidence, I conclude that the money was paid by the plaintiff to the defendant because of the threat made by him that, if the matter was not settled up, he would have her husband arrested. Consequently, as the payment was not a voluntary one, the defendant obtained no title whatever to such money, and the motion made at the close of the case for a dismissal of the complaint was properly denied.

There is no proof to sustain the contention urged by the defendant that the money paid did not belong to the plaintiff individually, but was the property of her husband, for whom the settlement was made. On the contrary, the undisputed evidence shows that the money so paid belonged exclusively to the plaintiff, and that she, not her husband, was a party to the agreement of settlement. More-

over, that the settlement was with the plaintiff personally is admitted by that portion of the answer which reads:

"The said plaintiff entreated, begged, and persuaded this defendant to settle said action and to avoid litigation, which accordingly was reluctantly done by said defendant, and resulted in the said agreement of settlement, and said money paid thereon by said plaintiff herein."

With equal untenability is it urged by the defendant that the agreement under which the money in question was paid was made by the plaintiff with defendant's wife, rather than with himself, for, as it is undisputed that he received the proceeds of the settlement, he cannot now be heard to repudiate the agency through which he obtained it. Krumm v. Beach, 96 N. Y. 398; Adams v. Bank, supra.

The defendant also seeks to disprove the fact of any threat, by insisting that he merely answered inquiries of the plaintiff concerning her husband, without making any remarks which were construable as a threat; and in support of this position he refers to the case of Lomerson v. Johnston, supra. Without disputing the correctness of the rule there stated, it should be observed in passing that in the case quoted the court found that Lomerson went to the defendant for the purpose of asking and persuading her to join her husband in the execution of a mortgage, and that in doing so he made allusions to the husband's criminal liability for the wrongful appropriation of trust funds. In the case at bar, however, the defendant not only informed the plaintiff that her husband's discharge was due to his larceny of money and liquors, but gratuitously vouchsafed the additional information that, while detectives were going to have her husband locked up, "it would go no further" if she paid up. Certainly this was not, under the circumstances, a legitimate answer to plaintiff's inquiry, but was, on the contrary, a direct threat to prosecute the husband unless a satisfactory settlement of the defendant's claim was made. In Williams v. Bayley, supra, the lord chancellor (Lord Cranworth), at page 209, used the following language, which is peculiarly applicable to the subject under discussion:

"It is not pressure in the sense in which a court of equity sets aside transactions on account of pressure, if the pressure is merely this: 'If you do not do such and such an act, I shall reserve all my legal rights, whether against yourself or against your son.' If it had only been, 'If you do not take on yourself the debt of your son, we must sue for it,' I cannot think that that amounts to pressure, when parties were at arms' length, and particularly when, as in this case, the party supposed to be influenced by pressure had the assistance of his solicitor,—not, indeed, on the first occasion, but afterwards, before anything was done. But if what really takes place is this: 'If you do not assist your son by taking on yourself the payment of these bills and notes, on which there are signatures which are said, at least. to be forgeries, you must not be surprised at any course we shall take;' meaning to insinuate, if not to say, 'We shall hold in our hands the means of criminally prosecuting him for forgery'— I say, if it amounts to that, that it is a very different thing."

The further argument advanced by the defendant, that the moneys in controversy were paid for the purpose of compounding a felony, is equally without reason. There is no evidence whatever that a criminal action was ever threatened by defendant,—much less, of an agreement on his part to abstain from prosecuting it. The reverse, however, is shown; the proof being that a civil suit only was

contemplated by the parties when the settlement was effected. But, even had other procedure been contemplated, it would not, in my opinion, have affected plaintiff's right to recover. In the case relied upon to support this proposition, moneys were paid by a father under an agreement that his son was not to be prosecuted criminally. Haynes v. Rudd, supra. And the proof showed that the moneys were paid voluntarily, and without a coercion of force or threats; and the court rested its decision solely on the ground that the consideration mentioned in the contract was entirely affected by the compounding of a felony. In the subsequent case of Schoener v. Lissauer, supra, the mortgage was procured by threats and menaces of the defendants that unless the plaintiff's ancestor, one Babet Marks, executed it, they would cause her son to be sent to the state prison for larceny and embezzlement committed while in their employ, and for which charge he was then under arrest and indictment. The defendants also stated to the sister and uncle of the prisoner that, if $2,000 were not paid, the accused would certainly go to the state prison. The defendants also conveyed a similar threat to the prisoner, unless his mother gave them $1,000 in cash and a mortgage for $1,999 upon certain property. Finally the mother complied with the terms of the proposition, while under the influence of fear, terror, coercion, and duress created by the threats of the defendants, and immediately thereafter the prisoner was discharged on his own recognizance. The court at special term, upon these facts, in an action brought by the heirs at law of said Babet Marks, deceased, rendered judgment directing cancellation of the mortgage, and requiring the defendants to discharge it of record. The court (Rapallo, J., giving the opinion) sustained the judgment, and held that there was no conflict with Solinger v. Earle, supra, or Haynes v. Rudd, supra.

Error is also claimed by defendant, predicable of the referee's ruling regarding an offer, upon cross-examination of the plaintiff, to show that she had testified falsely in another action, regarding matters foreign to this controversy, and that a justice of this court had so determined. The ruling of the referee was to the effect that he regarded such evidence as irrelevant and collateral to the issues in this action, and that upon that subject the defendant would make the witness his own if he interrogated her with respect thereto, and hence could not contradict her by other proof. Testimony was then elicited from the witness regarding her visit to the office of an attorney, but it was stricken out, upon plaintiff's motion, for failure to connect it; and to this the defendant excepted. This ruling of the referee, in my opinion, accords with well-established rules of evidence. 1 Greenl. Ev. (15th Ed.) § 449, p. 595. Inquiries as to a conversation had between the plaintiff and her husband before going to the attorney's office, and also a question as to whether the husband, while there, talked with the attorney about instituting a suit against the defendant, in respect to the bringing of which the plaintiff testified she had no recollection, were excluded under objection, and exceptions thereto were noted. The referee was justified in such disposition, inasmuch as the answer did not allege that the plaintiff

was not the real party in interest, nor was the nature of the action sought to be inquired about disclosed. A number of other exceptions were taken by the defendant, during the course of the reference, to the admission and exclusion of evidence, and to the disposition of a motion to conform the pleadings to the proof. These have all been examined in detail, and found to be without merit. After carefully considering the record, I am satisfied that no material error was committed upon the trial, and therefore favor the affirmance of the judgment, with costs.

Judgment affirmed, with costs. All concur.