ANNIE GORRINGE, Appellant, v. WILLIAM S. REED, Respondent.

UNLAWFUL TRANSACTIONS—EQUITY—WHEN ONLY RELIEF GRANTED—DURESS—CONTRACTS—PARTY EXERTING IMPROPER INFLUENCE—CAN OBTAIN NO ADVANTAGE—USE OF CRIMINAL PROCESS—TO OBTAIN UNDUE ADVANTAGE—PARTY GUILTY CAN NOT CLAIM BOTH PARTIES IN PARI DELICTO—CONTRACT INDUCED BY THREAT—IMPRISONMENT OF HUSBAND OR WIFE—PARENT OR CHILD—HOW AVOIDED—EVIDENCE—ACTION TO CANCEL DEED—PRIMA FACIE CASE—NON-SUIT.

1. UNLAWFUL TRANSACTIONS: EQUITY: WHEN ONLY RELIEF GRANTED. A court of equity, acting on the maxim, in *pari delicto potior est con-*

*ditio defendentis et possidentis,* will not interpose to aid parties who are concerned in unlawful transactions or agreements, but where public policy requires relief to be given, and when the parties though *in delicto,* are not *in pari delicto,* the maxim does not apply.

2. DURESS: CONTRACTS: PARTY EXERTING IMPROPER INFLUENCE: CAN OBTAIN NO ADVANTAGE. The very existence of a contract requires that the minds of the parties meet, and that it be executed freely and voluntarily by all contracting parties; and when one of the parties acts under constraint, induced by the other, and signs the instrument without voluntary assent to it, the party who exerted the improper influence, can take no advantage of the contract.

3. USE OF CRIMINAL PROCESS: TO OBTAIN UNDUE ADVANTAGE: PARTY GUILTY CAN NOT CLAIM BOTH PARTIES IN PARI DELICTO. One who makes use of the criminal process of the court for the purpose of overcoming the will of another to secure an advantage to himself, is not in a position to obtain and hold the fruits of a contract, whether executed or executory, so obtained, on the ground that both parties were *in pari delicto,* and that in equity the court will leave them where it finds them.

4. CONTRACT INDUCED BY THREAT: IMPRISONMENT OF HUSBAND OR WIFE: PARENT OR CHILD: HOW AVOIDED. The rule is that in relation to husband and wife or parent and child each may avoid a contract induced and obtained by threats of imprisonment of the other, and it is of no consequence whether the threat is of a lawful or unlawful imprisonment.

5. EVIDENCE: ACTION TO CANCEL DEED: PRIMA FACIE CASE: NON-SUIT. Where, in an action to set aside and cancel a deed, plaintiff shows that a deed was executed by her, without consideration other than an agreement not to prosecute her husband for an alleged crime, and under threats of prosecution and punishment if she did not sign it, a sufficient case is made to put defendant on his defense and a motion for a non-suit should be denied.

Decided January 7, 1901.

Appeal from the Second District Court Weber County.—*Hon. H. H. Rolapp,* Judge.

Action in equity to set aside and cancel a deed to certain real estate and to have plaintiff adjudged the lawful owner of the same. From a judgment for defendant plaintiff appealed.

REVERSED.

A. J. Weber, Esq., and Thomas Maloney, Esq., for appellant.

Plaintiff and defendant ought not to be held to have been *in pari delicto*. Ency. of Law (2 Ed.), vol. 6, pp. 416, 417; 2 Pomeroy Eq. Jur., par. 914; 2 Pomeroy Eq. Jur., par. 942; Meech v. Lee, 46 N. W. 399; Foley v. Greene, 14 R. I. 618, 51 Am. Rep. 419.

Upon the general subject of contracts made under duress we refer to: 2 Warville on Vendors, 864; Pom. Eq. Jur., 430-433, 451, 452; Heaton v. State Bank, 47 Pac. 576; Morse v. Woodworth, 29 N. E. (Mass.) 525; Hargreaves v. Koreck, 62 N. W. 1086; Heaton v. State Bank, 52 Pac. 876; Morrell v. Nightingale, 28 Pac. 1068; Thompson v. Miggley, 35 Pac. 290; Adams v. National Bank, 23 N. E. 7; Benedict v. Roome, 64 N. W. (Mich.) 193; Ency. of Law (2 Ed.), vol. 10, pp. 324, 325, 327; Adams v. Bank, 116 N. Y. 610; Grum v. Beach, 96 N. Y. 398.

Was there not imposition, oppression, duress, threats, undue influence, taking advantage of plaintiff's weakness and her fears by the Reed Brothers? Greene v. Densmore, 19 Iowa 466; Gohegan v. Leacg & Co., 24 Iowa 509; Vogue v. Glem, 41 Mich. 115.

Even as far back as the days of Coke fear of imprisonment was enough to avoid the deed. 2 Inst., 483 Co. Litt. 253b.

"As civilization has advanced, the law has tended much more strongly than it formerly did to overthrow everything

which is built upon violence and fraud." Foshay v. Ferguson, 7 Hill (N. Y.) 158; Tapley v. Tapley, 10 Minn. 367; 1 Story Eq. Jur., 239; Beindorff v. Kaufman, 41 Neb. 824, 60 N. W. Rep. 101; Hargreaves v. Koreek (Neb.), 62 N. W. Rep. 1086.

To threaten a wife with the imprisonment of her husband has been held menace. McMahm v. Smith, 47 Conn. 221; s. c., 36 Am. Rep. 67; Compton v. Bunker Hill Bank, 96 Ill. 301; s. c., 36 Am. Rep. 147; Singer Mfg. Co. v. Rawson, 50 Iowa 634.

"Illegality resulting from pressure, and illegality resulting from an attempt to stifle a prosecution, do not fall within that class of illegalities which induce the court to stay its end, *but are of a class in which the court has actively given its assistance in favor of the oppressed party by directing the money to be repaid.*" Davies v. Lindon & P. Marine Ins. Co., L. R., 8 Ch. Div. 469; 47 L. J. Ch. 511; 38 T. N. S. 478, 26 Week. Rep. 749. See note 26 Law Rep. Am. 50.

*Messrs. Richards & Allison* for respondent.

"Whenever an agreement appears to be illegal, immoral, or against public policy, a court of justice leaves the parties as it finds them; if the agreement be executed, the court will not rescind it; if executory, the court will not aid in its execution." Roll v. Ragent, 4 Ohio 420; Atwood v. Fish, 101 Mass. 364; Haynes v. Rudd, 102 N. Y. 372, N. E. 290; 1 Pom. Eq. Jur. (2 Ed.), sec. 401, et seq.; 2 Pom. Eq. Jur. (2 Ed.), sec. 937, et seq.; 6 Am. and Eng. Ency. of Law (2 Ed.), 412 et seq.; Banking Co. v. Lichtenstein, 10 Utah 338; Allison v. Hess, 28 Iowa 338; Booker v. Wingo (S. C.), 7 S. E. 49; Atwood v. Fish, 101 Mass. 363; Thomas v. Crouise, 16 Ohio 54; Swartzer v. Gillet, 2 Pin. (Wis.) 238; Moore v. Adams (Ohio), 32

Am. Dec. 723; Harrington v. Bigelow, 11 Paige (N. Y.) 349; Haynes v. Rudd, 102 N. Y. 372; Williams v. Bailey, 35 L. J. N. S. Ch. 717; Wilcox v. Daniels, 15 R. I. 261; Roll v. Ragnet, 4 Ohio 420; s. c., 22 Am. Dec. 759; Shattuck v. Watson, 53 Ark. 147, 13 S. W. 517; 2 Story on Cont., sec. 486; 2 Parsons on Cont., 746; 2 Addison on Cont., 715-724.

So when the contract is executed and money has been paid on property transferred in accordance therewith, the aid of the law *can not* be invoked for its recovery; and a deed of conveyance of land, made in consideration of a composition of felony, can not be avoided by the grantor.    Worcester v. Eaton, 11 Mass. 369; Taylor v. Blake, 11 Minn. 255; Dixon v. Olmstead, 9 Vt. 310; s. c., 31 Am. Dec. 629.

While it may be admitted that the decisions of the several states are not altogether harmonious on the subject of what threats constitute duress nevertheless it may readily be ascertained that a great number of courts of the highest respectability, hold that in just such cases as the one at bar there was no duress.    Indeed they hold that:

"It is those contracts *only* which are made under fear of *unlawful* imprisonment, and not those made under fear of imprisonment which would be legally justifiable, that can be avoided for duress."    Weber v. Barrett, 125 N. Y. 18; 25 N. E. 10.70; Knapp v. Hyde, 60 Barb. 80; Lester v. Manufacturing Co., 1 Hun. 288; Sanford v. Sornborger, 26 Neb. 295; 41 N. W. 1105; Mundy v. Whittemore, 15 Neb. 647; 19 N. W. 696; Bodine v. Morgan, 37 N. J. Eq. 426; Clark v. Trumbull, 47 N. J. L. 267; Thorn v. Pinkham, 84 Me. 101; Hilborn v. Buckman, 78 Me. 485; 57 Am. Rep. 816; Harmon v. Harmon, 61 Me. 227; Am. Rep. 556; Eddy v. Herrin, 17 Me. 338; Avery v. Layton, 118 Pa. 604; Fulton v. Hood, 34 Pa. St. 365; 75 Am. Dec. 664; Wilcox v. Howland, 23 Pick. 167; Compton v. Bank, 96 Ill. 301; Colglazier v. Salem, 61 Ind.

Gorringe v. Reed.

445; Dimmitt v. Robins, 74 T. 441; Landa v. Obert, 45 Tex. 547; Neely v. Greenough, 25 N. H. 332; Alexander v. Pierce, 10 N. H. 494; Shattuck v. Watson, 53 Ark. 147; 138 S. W. 517; Davis v. Luster, 64 Mo. 43; Claflin v. McDonough, 33 Mo. 412; 84 Am. Dec. 54; Waller v. Cralle, 8 B. Mon. 11; Hatter v. Greenlee, 1 Porter 222; Russell v. Durham, — Ky. —; 29 S. W. 635; Plant v. Gunn, 2 Woods 372; Carter v. Couch, 84 Fed. 735; 1 Devlin on Deeds (2 Ed.), secs. 81, 82; 6 Am. and Eng. Ency. of Law, p. 69; 10 Am. and Eng. Ency. of Law (2 Ed.), pp. 321-327; Story on Cont., 400.

The record shows that the house and lot deeded to the defendant was but a fair return in value for the merchandise stolen; that it was proper for the plaintiff to make the conveyance for that purpose and that it would be manifestly unjust and inequitable to decree the conveyance null and void.   6 Am. and Eng. Ency. of Law (2 Ed.), pp. 711, 716; Clark v. Turnbull, 47 N. J. L. 267; School Dist. v. Collins, 6 Dak. 145, 41 N. W. 466-471; Portner v. Kirschner, 169 Pa. St. 472, 47 Am. St. Rep. 925; Whitenack v. Ten Eyck, 3 N. J. Eq. 249; Brewery Co. v. Carry (Md.), 24 Atl. 152; Wolf v. Froxell, 94 Mich. 573; Miller v. Lumber Co., 98 Mich. 163; Papple v. Day, 123 Mass. 520; Abbott v. Fisher, 124 Mass. 414; Cohoes v. Cropsey, 55 N. Y. 685; Ford v. Crotty, 52 Ill. 313; Taylor v. Cottrell, 16 Ill. 93; Von Wandich v. Klaus, 46 Conn. 433; Walbridge v. Arnold, 21 Conn. 424.

## STATEMENT OF FACTS.

This is an action in equity to set aside and cancel a deed to certain real estate situate in Ogden City, and to have the plaintiff adjudged to be the lawful owner of the premises.   In the complaint it was alleged, among other things, that, on October 21, 1899, the plaintiff executed and delivered to the defendant

the deed in question; that she was the owner of the property conveyed, the same being her homestead of the value of $1,200; that the deed purports to have been executed in consideration of the payment of $800 by defendant to plaintiff, but that the conveyance was wholly without consideration, and was executed by her while she was under duress, which was caused by threats made by the defendant and his brother, J. G. Reed acting for him, to imprison plaintiff's husband in the penitentiary, and plaintiff believing that they could and would cause her husband to be prosecuted and imprisoned on the charge of grand larceny; that having been so put in fear by defendant's threats, and for no other reason whatever, plaintiff executed and delivered the deed; and that such threats were made to her by defendant and his brother, with the intention and for the purpose of cheating and defrauding plaintiff out of said realty.

It appears from the testimony that, at the time of the transaction complained of, the defendant and J. G. Reed belonged to the firm of Reed Brothers of Ogden, who, it seems, were conducting a harness store, and that Joseph Gorringe, the husband of the plaintiff had been in their employ for about fifteen years. He commenced purloining their goods early in the spring of 1899, and was arrested therefor, on October 27, of the same year. The largest amount of goods he had ever stolen at any one time was worth $2. He admitted the thefts, but what the exact value of all the stolen property was does not appear. There is evidence to the effect that after the arrest the goods were returned. The witness Joseph Gorringe, on this point testified: "I returned to them more than I ever took and paid them for more than I ever took not counting any property. They got back everything and more."

The evidence does not show that the plaintiff was aware of the pilfering while they were being made, but she was informed of them before she executed the deed. She was in front of

defendant's shop when the arrest was made, and her husband then told her he had done wrong. She then, according to her testimony, met the defendant, and, crying, asked him to help her husband. He said he would leave it to J. G. Reed, his brother. She then wanted to see her husband at the jail, before going home, was taken there, had a conversation with him, and was then taken home by J. G. Reed. As to what was said on the way, the plaintiff testified: "On the way home I was crying and pleading with him and asking him to let him off on account of the children, and he says: 'Mrs. Gorringe, this is a pretty serious case; it's a penitentiary case, do you know that?' And he says: 'Well it is;' and I was crying and asking him to let him off, and he says: 'Well, have you any money in the house?' I says: 'No, sir; we haven't $5,' and then he says: 'What property do you own in your name?' I told him all I had was the little home on Twenty-fifth street. He says: 'I will run up there and have a look at that place, and if it suits me we will make it up all right.'"

The next morning he, according to her story, told her "to sign it over" to him and he would "fix it up," and she said: "If it is to keep my husband out of the penitentiary I will come down and sign it." She thereupon went down and executed a deed to the property, but, it seems, something was wrong about it and Reed wanted another, but she did not go to execute it at the time requested about 3 o'clock. What occurred then, with respect to the deed is, in the language of the witness, as follows: "He came up about 4 o'clock and said: 'Mrs. Gorringe you never came down and signed that deed.' I says: 'No, sir; you did not keep your promise to my husband and I don't like to sign away all I have. You must consider I have six children to take care of.' He says: 'You will have to come down and sign that deed or I will go and make out a complaint of grand larceny.' This was about 4 p. m. on Monday. He

said if I wasn't down at half past nine the next morning he would change the complaint to grand larceny and send my husband to the penitentiary for from one and a half to five years. I says, Oh, if it is that, I will come rather than have him sent to the penitentiary. He said this to me many times. It frightened me. I was frightened. I was just crazy. I hardly knew whether I was willing or not. I couldn't sleep nights. I would walk the floor and look out of the window. I could just imagine I could see the officers coming after him. I have never been well since. No one was present when these threats were made except my husband and Reed. That was on Monday evening. I saw J. G. Reed at the court house next morning at 9:30. We stepped into the recording office and he had the papers written up, and I signed my name and the recorder said to J. G. Reed what name and he said W. S. Reed. I had no talk with Reed after coming out of the recorder's office. Reed said that if I ever brought any trouble or went and told any friend of it he would still hold it over him; he could still send him to the penitentiary after that. This was after the deed was signed. I never got anything for that property."

That threats were made, and that the plaintiff was excited and frightened, is also indicated by the testimony of other witnesses.

It appears that the property cost her over $1,000. Her husband was charged with stealing $3 or $4 worth of leather, and finally plead guilty to petit larceny. J. G. Reed was present and asked to have the case dismissed, but a fine of $25 was imposed. Reed told the witness Halverson that the "goods had been returned" and that "they were perfectly satisfied" and "wanted to get the penalty as light as possible."

At the close of the plaintiff's testimony, the court, on motion, granted a non-suit on the ground that none of the

material allegations of the complaint were sustained; that the plaintiff admitted that she executed the deed for the purpose of compounding a felony; and that she was therefore *in pari delicto* with the grantee in the deed. Judgment was entered accordingly, and from that judgment this appeal was taken.

Upon the facts being stated as above, BARTCH, C. J., delivered the opinion of the court:

The appellant insists that the court erred in sustaining the motion for non-suit, and that it is against public policy, good morals and conscience to permit a transaction, which is the result of duress, to stand. It is urged that, even if the parties were *in pari delicto,* the appellant is comparatively the more innocent, and that in furtherance of justice and sound public policy she ought to be granted full affirmative relief. The respondent maintains that the appellant is not entitled to the interposition of a court of equity; that affirmative aid should be refused, and the parties to the illegal transaction, left by the court where it found them; that the same principle controls whether the illegality is merely *malum prohibitum,* being in contravention of statute, or *malum in se,* as being contrary to public policy or good morals; and that contracts only which are made under fear of unlawful imprisonment can be avoided for duress. We are aware that some cases tend to support the contention of the respondent. Among them are Harmon v. Harmon, 61 Me. 227; Knapp v. Hyde, 60 Barb. 80; Bodine v. Morgan, 37 N. J. Eq. 426; Allison v. Hess, 27 Iowa 388; Landa v. Obert, 45 Tex. 539.

Such seems to be the trend of some of the earlier decisions, but the more recent adjudications, in cases like the one at bar, support the contention of the appellant. "It appears formerly to have been the rule that the imprisonment must have been unlawful, or, if lawful, undue force must have been used, or

the party made to endure unnecessary privation, to avoid which and to obtain his liberty he made the contract, while the mere fact of imprisonment was not deemed sufficient to avoid an agreement obtained through the medium thereof, if the party was in proper custody under the regular process of a court of competent jurisdiction. Again, the earlier cases made some fine and subtle distinctions in regard to the character of the threats which procured the execution of the contract; but as civilization has advanced the law has tended much more strongly than it formerly did to overthrow everything which is built on violence or fraud, and now, as a rule, all contracts procured by threats or imprisonment and the fear of injury to life, limb or property may be avoided on the ground of duress, whether on the part of the person to whom the promise or obligation is made, or on that of his agent. The reason of this is obvious; for in such case there is nothing but the form of a contract without the substance, and, wanting the voluntary assent of the party to be bound by it, the law will refuse to uphold it." 2 Warvelle on Vendors, 864.

It is no doubt true, as a general proposition that a court of equity, acting on the maxim, *in pari delicto potior est conditio defendentis et possidentis,* will not interpose to aid parties who are concerned in unlawful transactions or agreements, but where public policy requires relief to be given, and when the parties though *in delicto,* are not *in pari delicto,* as when, at the time of the transaction, the complainant was under undue influence, hardship or oppression or great inequality of condition or age existed, and acted involuntarily, the maxim does not apply. 1 Story's Eq. Jur., secs. 288, 300.

The reason is that, in such cases, the public interests and justice require relief to be given, even though the complaint be by one who is *particeps criminis.* And in this class of cases a court of equity may grant relief, not only by cancelling an

instrument, or setting aside an agreement or other transaction, but also, in a proper case; by compelling money paid under it to be refunded. All contracts and transactions, *contra bonos mores,* are unlawful and void in equity, and with a very few exceptions at common law. This is so as to agreements or transactions, executed or executory, entered into upon the consideration of the compounding of a felony, the forbearance to prosecute for a crime, abandonment of a pending criminal prosecution, or which directly or indirectly control or prevent the due administration of justice. When the object is to stifle a criminal prosecution, such an agreement or transaction is void, and although the parties are *in pari delicto,* equity may grant relief when the public good demands it. "Even where the contracting parties are in *pari delicto* the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him. In pursuance of this principle, and in compliance with the demands of a high public policy, equity may aid a party equally guilty with his opponent, not only by cancelling and ordering the surrender of an executory agreement, but even by setting aside an executed contract, conveyance, or transfer, and decreeing the recovery back of money paid, or property delivered in performance of the agreement. The cases in which this limitation may apply and the affirmative relief may thus be granted, include the class of contracts which are intrinsically contrary to public policy—contracts in which the illegality itself consists in their opposition to public policy, and any other species of illegal contracts, in which from their particular circumstances, incidents and collateral motives of public policy require relief." 2 Pom. Eq. Jur., 941, 936.

In the case at bar, from the evidence, which for the purpose of deciding the correctness of the judgment of nonsuit, we

must assume to be true, it appears that the complainant received no consideration for the property which she conveyed by deed to the defendant. Her husband admitted that he had committed the crime of larceny, and the defendant, or his agent, after the arrest of the husband, explained to her that it was a serious case, a "penitentiary offense," and then when implored by her to help her husband, for the sake of herself and children, and to save them from want and disgrace, the defendant left the matter to his agent. She was then asked whether she had any property or money, and, upon replying that she owned the real estate, in question herein, was told that if she would execute a deed to the defendant for that property they would make matters all right. Expressing her unwillingness to do this, she was given the choice to sign the deed or have her husband sent "to the penitentiary for from one and a half to five years." Frightened, and believing that her husband could be imprisoned in the penitentiary, and that her execution of the deed would save herself and family from want and disgrace, she consented to and did execute and deliver the instrument of conveyance.

Without further reference in detail, a fair result of the evidence, if it is in fact true, shows that the deed was executed and delivered under the influence felt by the grantor and exercised by the grantee, and that the result of the discovery of the criminal act, for which the wife was not liable, and the fear of the criminal prosecution and imprisonment of her husband, were used by the defendant, or his agent, to induce her to execute and deliver the deed. The evidence thus shows an attempt to gain an advantage or benefit from an influence improperly exerted, and indicates the use of the criminal process of a court for private and personal ends.

The important question of law here involved, therefore, is whether one who has discovered the commission of a crime

and has caused the arrest of the perpetrator, and who, by threats of prosecution and imprisonment, has overcome the will of the wife of the perpetrator, and induced her to execute a deed which she would not have willingly executed and delivered, can hold the property so conveyed, if the wife afterwards attempts to avoid the deed and have it cancelled on the ground of duress. It has sometimes been held that threats of unlawful imprisonment only can constitute duress, and some of the definitions of duress *per minas* are perhaps not broad enough to include threats of lawful imprisonment, but at present the rule has a broader application. "It is founded on the principle that a contract rests on the free and voluntary action of the minds of the parties meeting in an agreement which is to be binding upon them. If an influence is exerted on one of them of such a kind as to overcome his will and compel a formal assent to an undertaking when he does not really agree to it, and so to make that appear to be his act which is not his but another's, imposed on him through fear which deprives him of self-control, there is no contract unless the other deals with him in good faith, in ignorance of the improper influence, and in the belief that he is acting voluntarily." Morse v. Woodworth, 155 Mass. 233.

The very existence of a contract requires that the minds of the parties meet, and that it be executed freely and voluntarily by all the contracting parties. If then, in a case like the one shown by the evidence herein, one of the parties acts under constraint, induced by the other, and signs the instrument without voluntary assent to it, the party who exerted the improper influence, can take no advantage of the contract. The real question, in such case, is not whether the threats, relied upon as constituting duress, were of lawful or unlawful imprisonment, but whether they were of imprisonment which would be unlawful respecting the conduct of him who threatened and

sought to obtain a contract by use of the threats. Such imprisonment, resulting from the execution of threats made for the purpose of securing a contract or a conveyance of property, may be lawful with respect to the public or public authorities, but unlawful with respect to him who thus, for his own private benefit, made use of the criminal process of the court provided for the prosecution of crime and the protection of the public. One who, under circumstances, as now disclosed in this case, makes use of the criminal process of the court for the purpose of overcoming the will of another to secure an advantage to himself, is not in a position to obtain and hold the fruits of a contract, whether executed or executory, so obtained, on the ground that both parties were *in pari delicto,* and that in equity the court will leave them where it finds them. Under the weight of recent authority, at least, such parties, under such circumstances, can not be looked upon as equally at fault, although they are both guilty of a wrong. The inequality of their situation, the one exacting a deed to property which the other is compelled to execute and deliver against her will in order to save her husband from imprisonment in the penitentiary, and herself and children from disgrace and ruin, taints the transaction and renders voidable the instrument obtained under the influence of her fears. This is so because she was not acting as a free agent. The evidence does not show that the conveyance was the result of her own volition but of that of another, in reality not her contract but another's, and, in such case there is no reason why she should be held bound by the instrument. If, as indicated by the evidence now before us, her main and inspiring purpose was the release of her husband from the consequences of his crime and to preserve the standing of herself and family in society; if such was the consideration operating in her mind when she signed the deed, a court will not be justified in upholding the transaction.

Gorringe v. Reed.

In Williams v. Bayley, L. R. 1 Eng. and Irish App. Cas., H. L. 200, a son carried to bankers of whom he and his father were both customers, certain promissory notes with his father's name upon them as indorser. The indorsements were forgeries. The forgery was afterwards discovered; the son did not deny it; the bankers insisted, though without any direct threat of prosecution or imprisonment, on a settlement, to which the father was to be a party. At a meeting at which all the parties, including the father, were present, the banker's solicitor said it was "a serious matter," and the father's solicitor added, "a case of transportation for life;" finally the father executed an agreement to make an equitable mortgage of his property. The notes, with the forged indorsements, were then delivered up to him. Lord Westbury, holding the agreement invalid, in the course of his opinion, said: "It is perfectly clear that they did not pretend that the father was liable. What remained then as a motive for the father? The only motive to induce him to adopt the debt, was the hope that by so doing he would relieve his son from the inevitable consequences of his crime. The question, therefore, my Lords, is, whether a father appealed to under such circumstances, to take upon himself an amount of civil liability, with the knowledge that, unless he does so, his son will be exposed to a criminal prosecution, with the certainty of conviction, can be regarded as a free and voluntary agent? I have no hesitation in saying that no man is safe, or ought to be safe, who takes a security for the debt of a felon, from the father of the felon, under such circumstances. A contract to give security for the debt of another, which is a contract without consideration, is, above all things, a contract that should be based upon the free and voluntary agency of the individual who enters into it. But it is clear that the power of considering whether he ought to do it or not, whether it is prudent to do it or not, is altogether

taken away from a father who is brought into the situation
of either refusing, and leaving his son in that perilous condi-
tion, or of taking on himself the amount of that civil obliga-
tion."

Benedict v. Roone, 106 Mich. 378, is a case, in many
respects, quite similar to the one at bar. There the husband of
the complainant embezzled funds of his employers. The hus-
band's conduct was disclosed to the wife by the employers'
attorney who advised her that it constituted a criminal offense;
and on the same day she was informed by one of the employers
that he must have security or the money, or "there are the
papers," and "I shall go on with the proceedings." There-
upon the wife executed a mortgage to the employers upon her
individual property for the amount of her husband's defalca-
tion. In affirming a decree setting aside the mortgage as
having been procured by duress and undue influence, Mr. Jus-
tice GRANT, delivering the opinion of the court, said: "If the
court were to be governed alone by the words used to her by
them, the position of the defendants might be sustained; but
we can not ignore the conclusion that the conduct of her hus-
band was suddenly disclosed to her, that she understood that
he had committed a crime, and that the papers referred to by
Mr. Weir as lying upon the table were prepared as the basis
of a criminal prosecution. We think it clear that she gave
the mortgage under an implied threat of criminal prosecution.
If they so meant it, and she so understood it, and for that rea-
son gave the mortgage, it was obtained by duress and undue
influence, just as certainly as though an express threat had
been made."

So in Giddings v. Iowa Savings Bank, 104 Ia. 676, it
was said: "Where the fears or affections of a wife are worked
upon through threats made against her husband, and she is
induced thereby against her will, to convey her property to

Gorringe v. Reed.

secure his debt, there is duress as to her, even though the debt was valid, and the threat of lawful prosecution for a crime that had in fact been committed by the husband."

In Adams v. Irving National Bank, 116 N. Y. 606, it was said: "The rule is firmly established that in relation to husband and wife or parent and child each may avoid a contract induced and obtained by threats of imprisonment of the other, and it is of no consequence whether the threat is of a lawful or unlawful imprisonment." 6 Am. and Eng. Ency. of Law, 416, 417; 10 Am. and Eng. Ency. of Law, 324-327; 2 Pom. Eq. Jur. par. 942; 1 Story's Eq. Jur. secs. 239, 300; Hensinger v. Dyer, 147 Mo. 219; Town of Sharon v. Gager, 46 Conn. 189; Meech v. Lee, 82 Mich. 274; Heaton v. Bank, 59 Kas. 281; Foley v. Greene, 14 R. I. 618; Bently v. Robinson, 117 Mich. 691; Hargraves v. Korcek, 44 Neb. 660; Davis v. London & Provincial Marine Ins. Co., L. R. 8 Ch. Div. 469; Morrill v. Nightingale, 93 Cal. 452; Thompson v. Niggley, 53 Kas. 664; Osborne v. Williams, 18 Ves. Jr. 379; Gohegan v. Leach & Co., 24 Ia. 509; Biendorff v. Kaufman, 41 Neb. 824; Harris v. Carmody, 131 Mass. 51; McMahon v. Smith, 47 Conn. 221; Tapley v. Tapley, 10 Minn. 360; McCormick Harvesting Machine Co., 73 Wis. 486; Eadie v. Slimmon, 26 N. Y. 9; Lomerson v. Johnston, 44 N. J. Eq. 93; Holman v. Johnson, 1 Cowp. 341; Haynes v. Rudd, 30 Hun. 237; Claridge v. Hooane, 14 Ves. Jr. 59.

We are of the opinion that the plaintiff's testimony is of such a character as to require the defendant to put in his defense, and that the court erred in granting the motion for and entering the judgment of non-suit.

The case must be reversed, with costs, and the cause remanded with instructions to the court below to set aside the judgment of non-suit and proceed in accordance herewith. It is so ordered. *Baskin, J.,* concurs.

It is not absolutely clear from the testimony that plaintiff participated in the crime of stealing from the store of the defendant, although it is apparent that she endeavored to conceal the crime after its discovery. It also appears that when the officers were seeking for the stolen property at her house she told her husband "Now Joe be sure and not give up that stuff you bought at Salt Lake." The officers found 19 bags of stolen harness material in a room in plaintiff's house which was kept locked. Only these goods so found were returned to the defendant, although the husband had been pilfering from the store for eight months, and the estimated loss claimed was $800.

The plaintiff gave testimony tending to show that she executed the deed under duress, and by means of threats to prosecute her husband and send him to the penitentiary if she did not execute it. Under these circumstances I concur in the judgment of reversal, and in granting a new trial. *Miner, J.*